No. 103,521

STATE OF KANSAS, *Appellee*, v. REGINALD STAFFORD, *Appellant*.

(290 P.3d 562)

30

Opinion filed December 14, 2012.

*Catherine A. Zigtema*, of Maughan & Maughan LC, of Wichita, argued the cause, and *Carl F.A. Maughan*, of the same firm, was with her on the brief for appellant.

*Lesley A. Isherwood*, assistant district attorney, argued the cause, and *Nola Tedesco Foulston*, district attorney, and *Derek Schmidt*, attorney general, were with her on the brief for appellee.

The opinion of the court was delivered by

ROSEN, J.: Reginald Stafford and Evelyn L. Wells were separately charged and jointly tried and convicted of various person and off-grid felony offenses involving Wells' minor child, S.W. As a result, the facts and several issues stemming from this appeal are identical to those appearing in *State v. Wells*, No. 103,559, this day decided.

A jury found Stafford guilty of two counts of rape in violation of K.S.A. 21-3502(a)(2), an off-grid crime, and one count of aggravated criminal sodomy in violation of K.S.A. 21-3506(a)(1), an off-grid crime. On appeal, Stafford argues: (1) The district court erred when it denied his motion to conduct separate trials for him and his codefendant Wells; (2) the district court erred when it denied his motion to conduct a psychological evaluation of S.W., the complaining witness; (3) the district court improperly limited cross-examination of S.W.; (4) the district court erred by not striking a juror for cause; (5) the district court erred by admitting into evidence three of S.W.'s drawings; (6) the jury was presented with alternative means of finding Stafford guilty of aggravated criminal sodomy (oral), one of which was not supported by sufficient evidence; (7) the State presented insufficient evidence to convict Stafford of the crimes the jury found him guilty of committing; (8) the prosecutor committed reversible misconduct during his closing argument when he commented about Stafford's lack of response to an investigator's statement during a custodial interrogation; (9) cumulative error deprived Stafford of a fair trial; (10) the district court abused its discretion by denying Stafford's motion requesting a departure sentence; and (11) the district court's decision to impose three consecutive hard 25 life sentences was unconstitutional because such sentences constitute cruel and unusual punishment. Based on the analysis below, we find no merit to any of Stafford's arguments. Accordingly, we affirm his convictions and sentences.

## FACTS

Between August 2006 and July 2007, S.W., born April 19, 2001, lived with her mother, Wells; her stepfather, Rex; and her 12-year-old half-brother, Rocky, in a two-bedroom apartment in Wichita.

During this same time period, S.W.'s older half-brother, Robert (who graduated from high school during this time) stayed at the apartment periodically, and S.W.'s older half-sister, Jessica, along with her husband, Ruben Diaz, moved into the apartment. Jessica and Diaz would eventually separate, but Diaz continued living at the apartment after the couple's separation.

Sometime around December 2006, S.W. told Robert—then, with Robert's urging, told Rocky—that a person named "Reggie" had touched her vagina with his finger. Though Robert claimed that at the time he did not know a person named Reggie (a claim unsupported by Rocky's testimony), Rocky recognized the name as referring to Stafford, a person Rocky had known since he was 4 years old. Stafford, who lived nearby, would occasionally visit the apartment, and Wells would also visit Stafford at his home. Rocky said that Wells would sometimes take S.W. with her when she visited Stafford. Rocky estimated that this took place once every 2 to 3 months. Notably, Rocky said that on the day S.W. told him and Robert that Stafford had touched her, Wells had taken S.W. to Stafford's house. Wells had brought S.W. back to the apartment before going out again that evening with Stafford.

Robert and Rocky failed to tell anyone about S.W.'s statement. Regardless, sometime between December 2006 and March 2007, Diaz overheard Robert tell Rocky that he thought Wells had "sold [S.W.] for money," which Diaz interpreted as meaning Wells had prostituted S.W. to someone. Because he did not know whether Robert's statement was true, Diaz tried to observe something that would corroborate what he had heard before telling someone about Robert's statement. But after failing to notice anything to corroborate the statement, Diaz eventually told his boss, Robert Barnes, on Sunday, July 8, 2007, about overhearing the statement.

The next day, July 9, Barnes contacted authorities, resulting in Melissa Gardner, a social worker with the Kansas Department of Social and Rehabilitation Services (SRS), and William Riddle, a detective with the Wichita Police Department, going to the apartment that day to investigate the allegation. But neither Wells nor S.W. were at home that day. The next day, July 10, patrol officers went to the apartment and made contact with S.W. The officers

placed S.W. in protective custody and transported her to the Wichita Children's Home where she was interviewed by Gardner and Riddle. Rocky was also removed from the apartment that same day.

During her interview with Gardner and Riddle, S.W., who appeared to be happy and comfortable with being interviewed, did not disclose to them that she was being sexually abused. Gardner also spoke to Rocky and Robert on July 10. Rocky denied that S.W. had ever been inappropriately touched, and Robert told Gardner that he did not have any concerns about something bad happening to S.W. Robert failed to mention that S.W. had told him about a person named Reggie touching her vagina.

After S.W.'s interview was completed on July 10, she was placed in foster care with Joyce White-Dechant. Kerri Myers, an employee of Youthville, became S.W.'s case manager. According to White-Dechant, she was not aware of S.W.'s background or the allegation that she had been sexually abused when S.W. came to live with her. White-Dechant said that when S.W. first came to stay with her, S.W. was "very quiet, very distraught, angry, sleepless, wet the bed, didn't eat well, [and] had a stomach ache all the time." White-Dechant also said that S.W. had told her that she did not want to go home and was scared to do so. During the time S.W. lived with White-Dechant, S.W. attended counseling about twice a week.

In October 2007, White-Dechant came into the bathroom while S.W. was taking a bath and noticed that S.W. was fondling herself. White-Dechant asked S.W. if anybody had ever "bothered her." In response, S.W. ducked her head and did not answer. White-Dechant told S.W. that it was okay and that if she ever had anything she wanted to tell, White-Dechant would listen to her. White-Dechant then left S.W. in the bathroom and went to her own bedroom. A short time later, S.W. came into White-Dechant's bedroom and told her that there was something she needed to tell her. According to White-Dechant, S.W. said that she had been touched before. White-Dechant then asked S.W. if she had been touched more than once. S.W. said yes and stated that she had been touched on her "potty." White-Dechant asked if potty meant her private part, and S.W. said yes.

Initially, S.W. would not tell White-Dechant who had touched her, but she eventually identified the person as Wells' boyfriend, Reggie. According to White-Dechant, S.W. told her that Wells was trying to get money from Reggie in exchange for having sex with S.W. S.W. also told White-Dechant that Reggie lived "down and around the corner" from her apartment.

After S.W. made her disclosure, White-Dechant immediately contacted Myers, and Myers came to White-Dechant's home the next day to speak with S.W. On that day, Myers said that S.W. acted more anxious than usual and seemed distracted. After Myers had been there for a while, she asked S.W. if she had something that she wanted to talk about, and S.W. said that she did. At that point, White-Dechant left the room, leaving Myers and S.W. together by themselves. S.W. then told Myers that a man named Reggie had touched her. Using a female doll that White-Dechant had inside her house, Myers had S.W. show her on the doll where she had been touched. S.W. took the doll, laid it down on her lap with its legs facing her, lifted up the doll's skirt, and repeatedly poked the doll between its legs. Myers described the poking as "forceful and violent."

S.W. told Myers that Reggie lived down the street and that after he would touch her, Wells would take money from him. S.W. also said that Reggie and Wells would go into another room and that when they came out, Reggie would give Wells money. Myers asked S.W. what Reggie and Wells were doing in the other room, and S.W. spelled "s-e-x." Myers asked S.W. if anyone else had touched her, and S.W. said no, that Reggie was the only one.

On October 25, 2007, Myers reported S.W.'s disclosure to SRS. Gardner and Riddle tried to interview S.W. on November 8, 2007, but S.W. had the flu at that time. Accordingly, Gardner rescheduled the interview for November 20. Prior to that time, however, S.W. underwent a sexual assault examination on November 9, which did not reveal any physical injuries or show that S.W. had been infected with any sexually transmitted diseases. Kathy Gill-Hopple, the nurse who conducted the exam, asked S.W. if anyone had ever touched her in a way that made her feel mad or sad, and S.W. responded by saying Reggie touched her. S.W. pointed to her

vaginal area and said that Reggie had touched her down there underneath her clothes. When Gill-Hopple asked S.W. what part of Reggie's body touched her, S.W. pointed to her vaginal area and said that Reggie touched her with his "same spot." Gill-Hopple asked S.W. if Reggie had ever made her touch him, and she said no. But shortly thereafter, S.W. said that Wells had made her touch Reggie. When asked to explain more, S.W. said that Wells made her touch Reggie under his clothes and pointed to her vaginal area again to indicate the area of Reggie's body she was forced to touch. Gill-Hopple also asked S.W. if there were any other parts of her body that Reggie had touched. S.W. answered by pointing behind to her anal area and saying that Reggie had touched her butt with his "same spot" under her clothes.

On November 20, 2007, Gardner and Riddle interviewed S.W. Gardner summarized the interview as follows:

> "She reported that her mother took her to a man named Reggie's house. That they had walked there. That it was nearby her house. That her mother and Reggie had touched her on her—what she called potty, which she indicated on the drawing that was her vaginal area. She said that they touched her potty with their hands on the inside. She said they touched her bottom on the inside as well with their hands. And she said Reggie touched her potty with his lower part, which she indicated was his penis.
>
> "And she also reported that—I asked her if he asked—if Reggie asked her to touch him? She said that he asked her to put her mouth on his lower part. And she said she was scared, but her mom told her to do it and pulled her over to him. She said it was just like an ice cream cone and that white stuff came out. And that she was scared and crying and was screaming. And she said this happened multiple times. She gave a number of five times when we initially asked.
>
> "She also reported it happened on—that her potty—that her mom touched her potty seven times."

Riddle said that during this interview, S.W. stated that these acts occurred when she was in kindergarten during the 2006-2007 school year. According to Riddle, S.W. said the touching occurred after the school year had started but before Halloween.

After interviewing S.W. on November 20, Riddle asked Rocky if he knew a person named Reggie. Rocky said yes and gave Riddle descriptions of Reggie's house and vehicle. Based on Rocky's descriptions, Riddle determined that the name Reggie likely referred

to Stafford, who lived only a few blocks away—within walking distance—from the Wells' residence. After obtaining Stafford's driver's license photo, Riddle placed the picture in a photo lineup with five other photos and showed the lineup to Rocky. Rocky identified Stafford's photo as depicting Reggie.

On November 27, Gardner and Riddle conducted another interview of S.W. During the interview, Riddle showed S.W. the photo lineup and asked her if Reggie's picture was in the lineup. S.W. identified Stafford's photo as depicting Reggie. S.W. told Gardner and Riddle that Stafford had given Wells a "nasty movie" involving animals and people. S.W. said the people did "nasty things" to each other in the movie. S.W. told them she watched the movie at her house and at Stafford's house. Riddle also spoke with Rocky on November 27 and asked him if he was aware of anything that would be bothering S.W. Rocky said he was not aware of anything. But in January 2008, after the State filed charges against Stafford and Wells, Rocky disclosed to law enforcement that Robert had told him about S.W. being touched.

The State ultimately charged Wells and Stafford with two counts of rape in violation as K.S.A. 2006 Supp. 21-3502(a)(2) and two counts of aggravated criminal sodomy in violation of K.S.A. 2006 Supp. 21-3506(a)(1) (one charge alleging anal sodomy, the other alleging oral sodomy). The State also charged Wells with aggravated endangering a child in violation of K.S.A. 21-3608a(a)(1). The State alleged that all of these crimes occurred sometime between August 15, 2006, and July 10, 2007. Wells and Stafford, despite making requests to have separate trials, were represented by different attorneys at a joint jury trial.

At the trial, Rocky testified that he failed to disclose what S.W. had told him and Robert (that Stafford had touched her vagina) because he was afraid S.W. and he would be taken away from Wells. Robert testified that he did not contact the police or SRS because he was shocked by S.W.'s statement, causing him not to know what to do or how to react. Though Robert did not report S.W.'s statement to the authorities, he did claim that he went over to the apartment more often to keep an eye on S.W. and see if he could notice anything to corroborate S.W.'s story, which, according

to Robert, he never did. Robert also said that S.W. never told him that Wells was making her touch or submit to touching by Stafford.

S.W., who was 7 years old at the time of trial, testified that during the time she was in kindergarten, Wells took her to Stafford's home on multiple occasions. S.W. said that Stafford would touch her private every time that she was at his house, which she said occurred eight times. S.W. said Stafford would touch her while they were both naked in his bedroom and lying on a bed. According to S.W., while Stafford was touching her, Wells would be sitting naked on the same bed. S.W. said that Stafford's private touched the inside of her private and that Stafford also put his private inside her mouth. Notably, when S.W. was asked whether anyone had ever touched her "bottom" in a way that she did not like, S.W. said no.

S.W. said that after Stafford was finished touching her, he would give Wells money. S.W. admitted that though she did not actually see Stafford give Wells money, Wells told her about receiving money from Stafford. S.W. said that Wells would spend this money on "whiskey and cigarettes."

S.W. said that on the day she told Rocky and Robert about Stafford touching her, Wells had taken her to Stafford's home earlier that day. S.W. also said that she told White-Dechant about being touched by Stafford.

Wells and Stafford did not testify at trial, nor did they present any evidence. The jury acquitted Wells and Stafford of the aggravated criminal sodomy count alleging anal sodomy. But the jury found Wells and Stafford guilty of both rape counts and guilty of the aggravated criminal sodomy count alleging oral sodomy. The jury also found Wells guilty of aggravated endangering a child.

After denying Stafford's motion for a departure sentence, the district court ordered Stafford to serve a hard 25 life sentence for each of his two rape convictions and for his one conviction of aggravated criminal sodomy. The court ordered the life sentences to run consecutive to one another. Stafford filed a timely notice of appeal.

More facts will be stated as they become pertinent to the issues discussed below.

## Separate Trials

Stafford argues on appeal that his defense was prejudiced by him being joined with Wells for trial. Prior to trial, Stafford filed a motion seeking a separate trial. He asserted that his interests were adverse to Wells' interests and that the two defendants had different theories of defense. Following a hearing, the district court overruled Stafford's motion, noting that the defendants were taking the same position, a general denial of any wrongdoing. At trial, the defendants presented no witnesses and based their defense on the theory that the charged crimes never took place.

K.S.A. 22-3204 governs requests for severing trials: "When two or more defendants are jointly charged with any crime, the court *may* order a separate trial for any one defendant when requested by such defendant or by the prosecuting attorney." (Emphasis added.) As the "may" in K.S.A. 22-3204 suggests, severance is within the district court's discretion. Severance should occur, however, when a defendant establishes that there would be actual prejudice if a joint trial occurred. Stafford therefore has the burden of showing on appeal that actual prejudice occurred and that judicial discretion was abused by the denial of his motion to sever. See *State v. Reid*, 286 Kan. 494, 519, 186 P.3d 713 (2008).

This court has identified the following factors to consider in deciding whether the danger of prejudice requires severance:

"(1) [T]he defendants have antagonistic defenses; (2) important evidence in favor of one of the defendants which would be admissible in a separate trial would not be allowed in a joint trial; (3) evidence incompetent as to one defendant and introducible against another would work prejudicially to the former with the jury; (4) a confession by one defendant, if introduced and proved, would be calculated to prejudice the jury against the others; and (5) one of the defendants who could give evidence for the whole or some of the other defendants would become a competent and compellable witness on the separate trials of such other defendants." *Reid*, 286 Kan. 494, Syl. ¶ 15.

Stafford focuses on the first factor—antagonistic defenses—and asks this court to speculate that he *might* have presented a different kind of defense if tried separately—namely, that the crimes took place but were committed by some other individual. But mere speculation about antagonistic defenses does not require separate

trials. *State v. Pham*, 234 Kan. 649, 654, 675 P.2d 848 (1984). Furthermore, defenses will not be deemed antagonistic unless the defendants blame each other for the crime. See *State v. White*, 275 Kan. 580, 590, 67 P.3d 138 (2003). For example, in *Bruton v. United States*, 391 U.S. 123, 88 S. Ct. 1620, 20 L. Ed. 2d 476 (1968), the Supreme Court held that the admission of a defendant's confession implicating a codefendant constituted prejudicial error. Such a situation naturally turns one defendant into a witness hostile to the other defendant.

At their trial, Wells did not accuse Stafford of committing the crimes, and Stafford did not implicate Wells. They both presented a defense that the crimes did not take place. Simply stated, Wells did not present an antagonistic defense at trial that prejudiced Stafford. Accordingly, we conclude that the district court did not abuse its discretion in denying Stafford's motion for a separate trial.

## PSYCHOLOGICAL EXAMINATION

Prior to trial, Stafford filed a motion to compel a psychological examination of S.W., asserting that S.W. was not able to distinguish between truth and falsehood and was, therefore, disqualified as a witness under K.S.A. 60-417. The district court denied Stafford's request, finding that such an examination was unnecessary because the parties could perform a voir dire of S.W. at the preliminary hearing to determine whether she was qualified to be a witness. Prior to S.W. testifying at the preliminary hearing, the parties questioned her in order to discern whether she knew the difference between a truth and a lie. Based on this questioning, the district court found that S.W. was competent to testify.

Stafford argues on appeal that the district court erred in denying his request for a psychological examination of S.W. We review the district court's decision on a motion for a psychological evaluation of the complaining witness for abuse of discretion. *State v. Sellers*, 292 Kan. 117, 124, 253 P.3d 20 (2011).

"Judicial discretion is abused if judicial action (1) is arbitrary, fanciful, or unreasonable, *i.e.*, if no reasonable person would have taken the view adopted by the trial court; (2) is based on an error of law, *i.e.*, if the discretion is guided by an erroneous legal conclusion; or (3) is based on an error of fact, *i.e.*, if substantial

competent evidence does not support a factual finding on which a prerequisite conclusion of law or the exercise of discretion is based." *State v. Ward*, 292 Kan. 541, 550, 256 P.3d 801 (2011), *cert. denied* 132 S. Ct 1594 (2012) (citing *State v. Gonzalez*, 290 Kan. 747, 755-56, 234 P.3d 1 [2012]).

In general, a defendant is entitled to a psychological examination of a complaining witness in a sex crime if compelling circumstances justify such an examination. *State v. Berriozabal*, 291 Kan. 568, 580-81, 243 P.3d 352 (2010); *State v. Gregg*, 226 Kan. 481, 489, 602 P.2d 85 (1979). A determination of whether such compelling circumstances exist requires examination of the totality of the circumstances in the case, with the following nonexclusive list of factors to be considered: (1) whether there was corroborating evidence of the complaining witness' version of the facts, (2) whether the complaining witness demonstrates mental instability, (3) whether the complaining witness demonstrates a lack of veracity, (4) whether similar charges by the complaining witness against others are proven to be false, (5) whether the defendant's motion for a psychological evaluation of the complaining witness appears to be a fishing expedition, and (6) whether the complaining witness provides an unusual response when questioned about his or her understanding of what it means to tell the truth. *Berriozabal*, 291 Kan. at 581.

A district court typically does not abuse its discretion in refusing to order a psychological examination. See *Berriozabal*, 291 Kan. at 581. Further, as the party asserting an abuse of discretion, Stafford has the burden to show the district court abused its discretion in denying his request for a psychological examination. See *State v. Woodward*, 288 Kan. 297, 299, 202 P.3d 15 (2009).

Stafford claims the district court abused its discretion because, according to him, S.W. "repeatedly denied any sexual misconduct" in her initial interview with Gardner and Riddle on July 10. But this statement mischaracterizes S.W.'s answers at the interview. When conducting the interview, Gardner was careful not to directly ask S.W. whether she had been sexually abused. Instead, Gardner asked S.W. broad questions—such as asking her what types of things scared her—in an attempt to have S.W. disclose on her own whether she had been sexually abused. Thus, contrary to

Stafford's assertion, S.W. did not repeatedly deny being sexually abused at the interview with Gardner and Riddle because she was never directly asked at the interview whether she had been sexually abused. She merely failed to disclose that she was sexually abused in her responses to Gardner's broad questions.

Stafford also alleges that a family history of mental illness supported ordering a psychological evaluation of S.W. While the court did hear evidence at trial that one of S.W.'s half-brothers had mental health issues and that S.W.'s stepfather was schizophrenic, this evidence only supported a finding that mental health issues were present in the biologically unrelated side of S.W.'s family. There was no evidence presented to the district court to suggest that S.W. demonstrated any mental instability.

Accordingly, we conclude that the district court did not abuse its discretion when it denied Stafford's request for a psychological examination of S.W.

## LIMITATION OF CROSS-EXAMINATION

Next, Stafford argues that the district court erred when it prevented defense counsel from questioning S.W. about how deeply Stafford's penis penetrated her. Stafford argues that such questioning was crucial to his defense because if S.W. had testified that Stafford repeatedly penetrated her with his whole penis, the jury would have found her allegations of sexual abuse less credible given the fact that she was examined and found not to have any injuries to her vagina.

A district court may exercise reasonable control over the scope of cross-examination. A district court's decision to limit cross-examination is reviewed under an abuse of discretion standard. *State v. Parks*, 294 Kan. 785, 797, 280 P.3d 766 (2012).

*Applicable Facts*

During S.W.'s cross-examination, the following exchange took place:

"[Defense Counsel]: I'm not a girl, so I have to ask this question because I don't know. I don't have a girl's body. How—when you said Reggie's private went inside your private, how far inside you is that?

"[Prosecutor]: I'm going to object as to relevance.

"The Court: Well, the law does not require anything but any penetration. So limit your cross-examination to that.

"[Defense Counsel]: This goes to physical injuries, your Honor.

"The Court: Well, we don't have—you can limit your examination to what I've told you.

"[Defense Counsel]: All right.

"Q. (By [Defense Counsel]) [S.W.], I'm not going to ask that question of you. Okay.

"A. Okay.

"Q. I'm sorry. How did you know that Reggie's private was going inside you?

"A. I felt it.

"Q. Okay. Because, see, I'm not a girl, and I don't know these things. Right? I'm not as smart as you in that way. Did it hurt?

"A. Yeah.

"Q. Did it hurt a lot?

"A. Yes.

"Q. Okay. You know, have you ever cut your hands or something and seen your own blood? Have you ever cut yourself and had a Band-Aid put on?

"A. Um-hum.

"Q. Have you seen your own blood before?

"A. Um-hum.

"Q. Did you see—when Reggie was doing stuff to you, did you see any of your own blood then?

"A. No."

After S.W. testified, Gill-Hopple, the director of the Sexual Assault Nurse Examiner Program at Via Christi Medical Center and the nurse who conducted the sexual assault examination of S.W., testified at length about the signs of physical trauma that likely would be visible following sexual intercourse between an adult male and a young female. Gill-Hopple testified that she examined S.W. on November 9, 2007, 4 months after S.W. was removed from Wells' apartment and that she exhibited no signs of acute or healed injuries to her genitalia.

Gill-Hopple testified that there is no medical truth to the perception that penetration of the female sex organ necessarily affects the hymen, *i.e.*, one cannot look at the hymen to determine whether a female is a virgin. She further explained that even if a vagina suffers a tear from being penetrated, there is no guarantee that evidence of the tear will remain after it heals. Accordingly, the time between the last sexual encounter and the sexual assault ex-

amination plays a great role in determining whether injuries from the assault will be visible to an examiner. Notably, Gill-Hopple testified that it is "very normal" not to find visible injuries to the vagina 3 to 4 months after a sexual assault and that very rarely do pediatric patients show signs of injury—even when it is confirmed that they have been sexually penetrated and are examined within 72 hours after the encounter.

During cross-examination, Wells' attorney had the following exchange with Gill-Hopple:

"Q. And scarring—when we talk about the word scarring, that is evidence that there was a tear and now it's healed up but there's still some evidence that there had been a tear previously?

"A. That is the typical definition of a scar. Um-hum.

"Q. And based upon your expert opinion, or if you want to use common sense as well, multiple insertions of a male penis into a five-year-old vaginal opening is going to increase the likelihood of you being able to find tears or scarring?

"A. No, not necessarily.

"Q. So does it matter the depth of the insertion that would increase the likelihood?

"A. That's possible."

Neither Wells nor Stafford presented any evidence to contradict Gill-Hopple's testimony or to suggest that the depth of penetration determined whether a child's vagina would suffer lasting physical trauma.

*Analysis*

The question before us is: If S.W. had testified on cross-examination that Stafford's penis penetrated her deeply, could that testimony be considered relevant in determining whether S.W.'s allegation of rape was credible, given the fact that S.W. exhibited no signs of acute or healed injuries to her genitalia? K.S.A. 60-401(b) defines relevant evidence as evidence that is probative and material. In analyzing whether the evidence is material, the focus is on whether the fact at issue has a legitimate and effective bearing on the decision of the case and is in dispute. Evidence is probative if it has any tendency to prove any material fact. *State v. Gilliland*, 294 Kan. 519, 540, 276 P.3d 165 (2012).

S.W.'s credibility was a material issue at trial because it certainly had a legitimate and effective bearing on the jury's determination of whether Wells and Stafford had committed the criminal acts against S.W. And because Wells and Stafford denied that S.W. was ever sexually abused, S.W.'s credibility was certainly in dispute at trial. But the evidence presented at trial indicates that any testimony S.W. could have given regarding how deeply she was penetrated would have provided little probative value to establishing her lack of credibility.

First, it is unclear what meaningful answer S.W. could have given to the question of how deeply Stafford penetrated her. We question whether a 7-year-old child would have a baseline for measuring the difference between a "deep" and a "shallow" penetration. Regardless, defense counsel was able to ask S.W. whether the penetration hurt and whether she bled as a result. S.W.'s answers to these questions—that the penetration did hurt but did not cause her bleeding—would indicate that there was penetration enough to cause S.W. pain but not necessarily physical injury. This testimony would be consistent with Gill-Hopple's testimony at trial stating that pediatric patients rarely show signs of injury after being sexually penetrated. Gill-Hopple noted that this was true even in cases where it is confirmed that the child has been penetrated and is examined within 72 hours after the sexual encounter. Furthermore, Gill-Hopple stated that even if there is a vaginal tear as a result of a sexual encounter, there is no guarantee that evidence of the injury will remain after it heals. Further, she testified that it is normal not to find visible injuries to the vagina 3 to 4 months after a sexual assault. As noted above, Gill-Hopple did not examine S.W. until 4 months after she was removed from Wells' home.

Based on Gill-Hopple's testimony, the fact that S.W. exhibited no signs of acute or healed injuries to her genitalia would not have contradicted her claim that Stafford had penetrated her. Accordingly, even if S.W. had testified that Stafford penetrated her deeply, such testimony would have done little to discredit S.W.'s allegation of being raped. Accordingly, we conclude that the district court did not abuse its discretion when it prevented defense counsel

from questioning S.W. about how deeply Stafford had penetrated her.

### FAILURE TO STRIKE JUROR FOR CAUSE

During voir dire, juror R.H. said, "I don't believe I have any presumptions about anything. I know that in my personal and business life when I presume something that seems to be when I get in trouble. I don't presume anything." Stafford contends that R.H.'s statement indicated that he rejected the presumption that a defendant is innocent until proven guilty. Accordingly, Stafford argues that the district court should have struck R.H. for cause.

Because the district court was in a position to view R.H.'s demeanor as he was being questioned, we apply an abuse of discretion standard of review to the district court's failure to strike R.H. for cause. The party asserting an abuse of discretion bears the burden of establishing it. *State v. McCullough*, 293 Kan. 970, 996, 270 P.3d 1142 (2012).

The voir dire transcript clearly shows that R.H. made his statement about not presuming anything when the prosecutor was questioning the jury pool about evaluating the credibility of child witnesses. The rather lengthy dialogue went as follows:

"[PROSECUTOR]: Let me give you an example. You've got 200 nieces and nephews. You've got one that you can think of right now. The child comes to you and says, I went to the moon yesterday. And you say, oh, really, tell me about it, and they tell you some crazy story. Or they come to you and they say, I went to a game at Lawrence-Dumont. I watched the Wing Nuts. Okay. Well, I didn't think she went there. Well, yeah, I did. When you walk in, there's a guy standing there and he offers you a brochure deal and he says—and she starts describing the popcorn vendors and she's describing the way the game is played, she's describing the sights and the sounds and the smells. And you remember the train went back there behind the outfield, and it's fun. And you're going the more details she's giving you does that affect—I mean, it's one thing for the kid to go, I went to the moon and make up a story, but if they're able to provide details to you, does that matter?

. . . .

"[R.H.] on the front row.

. . . .

"Any thoughts on what I'm saying? I guess bottom line is, you're going to have to judge the credibility of witnesses. I'm—cards on the table. I'm most concerned

about how we're going—if any of you have any predisposed ideas about how you're going to judge a kid. Any of this concern you what I'm saying?

"PROSPECTIVE JUROR [R.H.]: No. *I don't believe I have any presumptions about anything. I know that in my personal and business life when I presume something that seems to be when I get in trouble. I don't presume anything.*

"[PROSECUTOR]: All right. If you—in trying to judge the credibility of a witness, and then the things that we've talked about strike you as being illegitimate, poor reasons to make a decision just because it gives us a lot of details, it may not mean anything at all.

"PROSPECTIVE JUROR [R.H.]: It seems reasonable. First premise, she or he goes to the moon. You figure that's pretty—

"[PROSECUTOR]: Unless NASA has got a new program, I don't know about.

"PROSPECTIVE JUROR [R.H.]: Yeah, that's not probably true.

"The other, also, there's more credibility to the second story if you'd been there as well. You've been to Lawrence-Dumont and you know what gate you go in and the smells are like.

"[PROSECUTOR]: All right. Okay. I feel like I'm taking up all afternoon, and low and behold [*sic*], I have." (Emphasis added.)

The context of these questions and answers is unmistakably about witness credibility; the questions and answers do not address the presumption of innocence. Stafford takes a short portion of the exchange out of that context in order to assert error.

Additionally, the prosecutor specifically raised the importance of the presumption of innocence at a different point in the voir dire, directing the jurors to consider whether the State proved its case. Stafford's defense counsel also inquired about the jurors' willingness to presume the innocence of the defendants. The jury instructions also directed the jury that it "must presume that [the defendants] are not guilty unless you are convinced from the evidence that they are guilty." A jury is presumed to follow its instructions. *State v. Reid*, 286 Kan. 494, Syl. ¶ 18, 186 P.3d 713 (2008).

R.H. gave an entirely appropriate answer. He stated that he would not presume the truth or falsehood of a witness' statement on its face. He made no reference to the presumption of innocence. The district court did not abuse its discretion in failing to strike R.H. for cause.

## ADMITTING S.W.'S DRAWINGS INTO EVIDENCE

Over defense counsel's objection, the district court admitted into

evidence three pictures that S.W. drew while she was in foster care with White-Dechant. White-Dechant testified that S.W. identified the stick-figures in the drawings as representing herself, Wells, and "mom's boyfriend" and that the stick-figures were on a bed. White-Dechant also testified that S.W. said that the boyfriend had touched and hurt her, which was depicted in the drawings.

During her direct examination, S.W. testified about the pictures, claiming that two of the pictures depicted her, Wells, and Stafford on a bed and that in one of the two pictures all three of them were naked. In the third picture, S.W. stated that only Wells and Stafford were depicted and that they were on a bed. The prosecutor also asked S.W. questions about specific things depicted in the pictures, but S.W. said she could not remember what they were. On cross-examination, Wells' attorney asked S.W. whether she spelled the words written on the pictures, and S.W. explained that she had received help with spelling some of the words. Stafford's attorney did not ask S.W. any questions regarding the pictures, but did ask S.W. about details she had provided to the interviewers regarding the sexual abuse. S.W. had some trouble recalling what she had told to the various interviewers.

On appeal, Stafford argues that the district court erred when it admitted into evidence S.W.'s three drawings, contending that the drawings constituted inadmissible hearsay under K.S.A. 60-460 because S.W. was effectively unavailable for cross-examination "regarding the drawings and the acts depicted by the drawings due to her inability to recall and testify to specific events depicted in the drawings."

The issue of whether the district court complied with K.S.A. 60-460 when it admitted the drawings into evidence requires statutory interpretation, which we review de novo. *State v. Robinson*, 293 Kan. 1002, 1023, 270 P.3d 1183 (2012). Furthermore, because S.W.'s testimony is of record, this court is as well equipped as the district court to determine the issue of witness availability. Accordingly, this court's standard of review is de novo. See *State v. Carter*, 278 Kan. 74, 77-78, 91 P.3d 1162 (2004).

K.S.A. 60-460 defines hearsay as "[e]vidence of a statement which is made other than by a witness while testifying at the hear-

ing, offered to prove the truth of the matter stated." Generally, hearsay is inadmissible at trial, but when the declarant of the statement is present at trial, "available for cross-examination with respect to the statement and its subject matter," and the statement itself "would be admissible if made by the declarant while testifying as a witness," then the statement can be admitted into evidence pursuant to subsection (a) of K.S.A. 60-460.

We find that the drawings are hearsay evidence. The State clearly offered the drawings into evidence at trial for purpose of proving the truth of what S.W. said was depicted within the drawings, *i.e.*, that Wells abetted Stafford in raping S.W. S.W. told White-Dechant that the pictures depicted a man she later identified as Stafford touching her in a way that hurt her while they and Wells were on a bed.

In support of his claim that the pictures were inadmissible because S.W. was effectively unavailable for cross-examination regarding the pictures, Stafford cites to our decision in *State v. Lomax & Williams*, 227 Kan. 651, 608 P.2d 959 (1980). In *Lomax & Williams*, a witness testified at a preliminary hearing in a related case about the incident at issue and identified the defendants as the perpetrators. At the defendants' trial, however, the witness denied any memory of the incident. Over the defendants' objection, the prosecutor was allowed to ask the witness leading questions regarding her testimony at the preliminary hearing, which resulted in the prosecutor reading from the transcript of the proceeding while questioning the witness. When asked about the questions posed to her at the proceeding and her answers, the witness repeatedly claimed she could not remember being asked the questions or her responses to the questions. Similarly, on cross-examination, the witness claimed a lack of memory prevented her from answering the defendants' questions.

On appeal, the defendants argued that the witness' inability to testify at trial due to her claimed memory loss rendered her unavailable as a witness. We agreed with the defendants' argument, concluding that even though the witness was physically present for trial, she was unavailable for cross-examination because "she simply refused to testify." *Lomax & Williams*, 227 Kan. at 661. Her con-

sistent responses of "I don't know" or "I don't recall" on all pertinent points made her just as unavailable as a witness as that of a person whose physical presence at trial could not be procured. *Lomax & Williams*, 227 Kan. 651, Syl. ¶ 3. As a result, we deemed her earlier testimony—occurring at a proceeding where the defendants did not have the opportunity to cross-examine her—inadmissible. *Lomax & Williams*, 227 Kan. at 655-62.

We later limited our holding in *Lomax & Williams* for determining witness availability. In *State v. Osby*, 246 Kan. 621, 632-33, 793 P.2d 243 (1990), we held that if the declarant, while testifying at trial, answers some questions concerning the subject matter of the out-of-court statement, yet refuses or is unable to answer other questions, the declarant is considered "available" for cross-examination and, accordingly, his or her prior out-of-court statement may be properly admitted into evidence under K.S.A. 60-460(a). See also *State v. Jefferson*, 287 Kan. 28, 38, 194 P.3d 557 (2008) (wholesale refusal of witness to testify renders witness unavailable, citing K.S.A. 60-459[g]); *Carter*, 278 Kan. at 79-80 (because declarant testified to some of the details of the incident at trial, declarant's prior testimony identifying defendant as the perpetrator was properly admitted at trial despite the fact that declarant claimed at trial that he could not identify the defendant as the perpetrator and claimed to have forgotten doing so at the earlier proceeding); *State v. Young*, 277 Kan. 588, 601-02, 87 P.3d 308 (2004) (witness is deemed available for cross-examination at trial when witness testifies to some facts regarding incident but claims a lack of memory prevent him or her from testify about other facts regarding incident).

Here, both Stafford's and Wells' attorneys conducted cross-examinations of S.W., totaling 26 pages of trial transcript. Though S.W. was unable to answer some of their questions due to a lack of memory, she answered a majority of their questions regarding her allegations of sexual abuse. With regard to her drawings, Wells' attorney asked S.W. whether she spelled the words written on the pictures and S.W. explained that she had received help with spelling some of the words. Stafford's attorney did not ask S.W. any questions regarding the pictures. Based on the transcript of S.W.'s

testimony at trial, we find that S.W. was available for cross-examination regarding her drawings and the acts depicted within the drawings because she testified at trial—on direct and on cross-examination—about both subjects. Accordingly, we conclude that S.W.'s drawings were admissible at trial pursuant to K.S.A. 60-460(a).

### ALTERNATIVE MEANS

Next, Stafford argues that the district court's instruction on aggravated criminal sodomy (oral) established alternative means for committing the crime. In support of this contention, Stafford points to the district court's instruction on sodomy, defining the act in part as "oral contact or oral penetration of the female genitalia *or* oral contact of the male genitalia." (Emphasis added.) Stafford contends that this definition instructed the jury that it could find him guilty of aggravated criminal sodomy (oral) under two alternative means—oral contact or oral penetration of the female genitalia *or* oral contact of the male genitalia. Stafford concedes that there was evidence of oral contact of the male genitalia (*i.e.,* Stafford placed his penis inside S.W.'s mouth), but he argues that because there was no evidence presented at trial that S.W.'s vagina was ever orally contacted or orally penetrated, his conviction for aggravated criminal sodomy (oral) must be reversed pursuant to the super-sufficiency requirement of *State v. Wright*, 290 Kan. 194, 224 P.3d 1159 (2010), and *State v. Timley*, 255 Kan. 286, 875 P.2d 242 (1994).

As we recently noted in *State v. Brown*, 295 Kan. 181, Syl. ¶¶ 3-6, 284 P.3d 977 (2012), we begin our analysis of an alternative means issue by looking at the language used in the applicable statute (or in this case, statutes) to determine whether the legislature intended to establish alternative means through the use of the language at issue. Issues of statutory interpretation and construction, including issues of whether a statute creates alternative means, raise questions of law reviewable de novo on appeal. See *State v. Burnett*, 293 Kan. 840, 847, 270 P.3d 1115 (2012); see also *State v. Kesselring*, 279 Kan. 671, 678, 112 P.3d 175 (2005) (court exercises de novo review over jury unanimity issues). The most fun-

damental rule of statutory construction is that the intent of the legislature governs if that intent can be ascertained. *State v. Arnett*, 290 Kan. 41, 47, 223 P.3d 780 (2010). An appellate court's first attempt to ascertain legislative intent is through an analysis of the language employed, giving ordinary words their ordinary meaning. *State v. Urban*, 291 Kan. 214, 216, 239 P.3d 837 (2010). If a statute is plain and unambiguous, an appellate court does not need to speculate further about legislative intent and, likewise, the court need not resort to canons of statutory construction or legislative history. *Urban*, 291 Kan. at 216.

*Analysis*

In *Brown*, we provided the following guidelines for determining whether the legislature intended for language of a statute to establish alternative means of committing a crime or whether the language merely describes a single means of committing the crime:

"[I]n determining if the legislature intended to state alternative means of committing a crime, a court must analyze whether the legislature listed two or more alternative distinct, material elements of a crime—that is, separate or distinct *mens rea, actus reus*, and, in some statutes, causation elements. Or, did the legislature list options within a means, that is, options that merely describe a material element or describe a factual circumstance that would prove the element? The listing of alternative distinct, material elements, when incorporated into an elements instruction, creates an alternative means issue demanding super-sufficiency of the evidence. Often this intent can be discerned from the structure of the statute. On the other hand, the legislature generally does not intend to create alternative means when it merely describes a material element or a factual circumstance that would prove the crime. Such descriptions are secondary matters—options within a means—that do not, even if included in a jury instruction, raise a sufficiency issue that requires a court to examine whether the option is supported by evidence." *Brown*, 295 Kan. at 199-200.

We also noted in *Brown* that words or phrases stated in a series and separated by the disjunctive "or" do not establish alternative means of committing a crime if they fail to state additional and distinct ways of committing the subject crime, that is, if they do not require proof of at least one distinct, material element of *mens rea, actus reus*, or causation. See *Brown*, 295 Kan. 181, Syl. ¶ 7.

At the time of the offense, K.S.A. 21-3506(a)(1) defined aggravated criminal sodomy as "[s]odomy with a child who is under 14

years of age." The language at issue in this case comes from K.S.A. 21-3501(2), which defines the act of sodomy as *"oral contact or oral penetration of the female genitalia or oral contact of the male genitalia;* anal penetration, however slight, of a male or female by any body part or object; or oral or anal copulation or sexual intercourse between a person and an animal." (Emphasis added.)

K.S.A. 21-3506(a)(1) proscribes the aggravated crime of engaging in the act of sodomy with a child who is under 14 years of age. The language and punctuation of K.S.A. 21-3501(2) indicates that there are three general but distinct ways in which one can complete the act of sodomy: (1) oral contact of genitalia, (2) anal penetration, and (3) sexual intercourse with an animal. See *State v. Burns*, 295 Kan. 951, Syl. ¶ 7, 287 P.3d 261 (2012). We note that each act described within the definition of sodomy is separate and distinct from the other—the acts are factually different from one another, and one act is not inclusive of the others. Furthermore, each act is separated by a semicolon, which suggests that the legislature intended for each act to constitute a specific means of completing the general act of sodomy.

Stafford contends that the language used to describe the first means of completing the act of sodomy—oral contact of genitalia—contains separate means within itself (*i.e.*, oral contact or oral penetration of the female genitalia is one means and oral contact of the male genitalia is the other means). We reject this argument because the phrase "oral contact or oral penetration of the female genitalia or oral contact of the male genitalia" does not state material elements of sodomy but merely gives a full description of one means of committing sodomy—oral contact of genitalia. The distinction between female and male genitalia contained within the phrase is superficial and unnecessary. Orally contacting genitalia encompasses both oral contact and oral penetration of the female genitalia as well as oral contact of the male genitalia. See *State v. Britt*, 295 Kan. 1018, Syl. ¶ 5, 287 P.3d 905 (2012) (reaching same conclusion).

The phrase "oral contact or oral penetration of the female genitalia or oral contact of the male genitalia" does not create alternative means and, consequently, does not trigger concerns of jury

unanimity or demand application of the super-sufficiency requirement. Consequently, Stafford is not entitled to reversal of his conviction for aggravated criminal sodomy.

Because we conclude that the jury in this case was not instructed on alternative means of committing aggravated criminal sodomy (oral), we decline to address the State's argument that *Wright* (rejecting application of a harmless error analysis in alternative means cases) was wrongly decided.

## SUFFICIENCY OF THE EVIDENCE

Next, Stafford argues that the State presented insufficient evidence to convict him of two counts of rape and one count of aggravated criminal sodomy (oral). When the sufficiency of the evidence is challenged in a criminal case, the standard of review is whether, after review of all the evidence, viewed in the light most favorable to the prosecution, the appellate court is convinced that a rational factfinder could have found the defendant guilty beyond a reasonable doubt. Furthermore, when making a sufficiency of the evidence determination, appellate courts do not reweigh evidence, resolve evidentiary conflicts, or make determinations regarding witness credibility. *State v. McCaslin*, 291 Kan. 697, 710, 245 P.3d 1030 (2011).

In support of his argument, Stafford notes that there was no evidence of physical injury to S.W. and no physical evidence supporting his convictions. Stafford also points to inconsistencies between the witnesses' testimony as to how the sexual abuse was discovered and who was present when S.W. disclosed the sexual abuse to various family members. Stafford also complains that S.W. used different language to describe the sexual abuse during different interviews, was unable to distinguish between individual events, was unable to pinpoint a specific time for her allegations, and had motive to fabricate allegations of sexual abuse because she did not want to return to Wells' custody.

By making these arguments, Stafford is clearly asking us to reweigh the evidence, resolve conflicts in the evidence, and determine the credibility of numerous witnesses, tasks which we cannot perform on appeal. See *McCaslin*, 291 Kan. at 710. Reviewing the

evidence in the light most favorable to the prosecution, we find that S.W. disclosed to multiple people that she was sexually abused and described the abuse in a manner that was generally consistent (*i.e.*, Wells took S.W. to Stafford's house numerous times during the 2006-2007 school year where Stafford raped and orally sodomized her). Though S.W. could not give exact dates at trial as to when the acts occurred, Riddle stated that S.W. indicated at a November 20 interview that Stafford had molested her after she had started kindergarten but before Halloween. Furthermore, S.W. testified at trial that on the same day she made her disclosure to Robert and Rocky that Stafford was sexually abusing her, Wells had taken her to Stafford's house earlier that day where he had molested her. Consistent with this testimony, Rocky stated at trial that on the same day S.W. made her disclosure to him and Robert about Stafford touching her, Wells had taken S.W. to Stafford's home earlier that day and had brought her back to the apartment before going out that evening with Stafford. Rocky believed this occurred sometime around December 2006.

Thus, the evidence presented at trial established that Stafford, with Wells' assistance, raped and orally sodomized S.W. multiple times throughout the 2006-2007 school year and that one of these instances occurred prior to Halloween 2006 and a second instance occurred around Christmas 2006.

Finally, Stafford notes that in count 1 of the second amended information (charging rape), the State alleged that the crime occurred "on or about the 15th day of August 2006 and the 10th day of July 2007." Stafford also notes that the jury's instruction on count 1 mirrored this language. Stafford argues that the language required the State to prove that the rape charged in count 1 occurred on August 15, 2006, *or* July 10, 2007. Accordingly, Stafford contends that because there was no evidence presented at trial to establish that S.W. was raped on either of these two dates, his conviction for count 1 is not support by sufficient evidence.

We reject this argument because a fair reading of the language would clearly indicate to a reasonable person that the State was alleging that the rape occurred sometime between the two dates. Regardless, we have stated:

"Generally, the exact date that an offense was allegedly committed is not an element of the crime. This court has held where a defendant is not misled or prejudiced in making his or her defense by the allegation of when the crime occurred, a conviction may properly follow upon sufficient proof that the crime was committed at any time within the period of the statute of limitations." *State v. Colston*, 290 Kan. 952, 963, 235 P.3d 1234 (2010).

Stafford does not claim that the lack of a specific date misled him or prejudiced him in making a defense to count 1. Nor does he claim that insufficient evidence was presented at trial to establish that the rape charged in count 1 occurred within the statute of limitations.

We conclude that the State presented sufficient evidence to convict Stafford of two counts of rape and one count of aggravated criminal sodomy (oral).

## PROSECUTORIAL MISCONDUCT

Next, Stafford claims the prosecutor referred to his post-*Miranda* silence during closing argument, thereby violating his constitutional rights as recognized in *Doyle v. Ohio*, 426 U.S. 610, 617-19, 96 S. Ct. 2240, 49 L. Ed. 2d 91 (1976).

"Appellate review of an allegation of prosecutorial misconduct requires a two-step analysis. First, an appellate court decides whether the comments were outside the wide latitude that a prosecutor is allowed in discussing the evidence. Second, if misconduct is found, an appellate court must determine whether the improper comments prejudiced the jury against the defendant and denied the defendant a fair trial. [Citations omitted.]" *State v. Marshall*, 294 Kan. 850, 856, 281 P.3d 1112 (2012).

### Applicable Facts

Stafford was taken into custody on November 30, and Riddle interviewed him on that same day. Before interviewing Stafford, Riddle informed him of his *Miranda* rights. Stafford waived his rights and agreed to speak with Riddle. Although the transcript of Riddle's interview of Stafford was not admitted into evidence, Stafford's defense counsel asked Riddle on cross-examination whether Stafford consistently denied sexually abusing S.W. during the interview. Riddle said yes. On redirect examination, the prosecutor had the following exchange with Riddle:

"Q. Last questions—series of questions. When you first sat down and interviewed Mr. Stafford, did you tell him what you were there about or were you trying to, you know, hold something back, or did you tell him explicitly what this has to do with is this has to do with your sexual contact with [S.W.]?

"A. Yes, sir.

"Q. Flat out tell him that before you begin the interview?

"A. Yes, sir.

"Q. Did he stop you right there and say what are you talking about?

"A. No, sir.

"Q. Raise his tone of voice with you?

"A. No. No, sir.

"Q. Even interrupt you?

"A. No, sir.

"Q. No response?

"A. Well, we—I mean, we just continued talking.

"Q. You continued to talk?

"A. Yes, sir.

"Q. Tell him it's about [S.W.] specifically. And pages later, when you asked him a direct question, he says, no, I never had contact with her?

"A. Right. Yes, sir."

During the State's closing argument, the prosecutor made the following comment regarding Stafford's response to Riddle's initial statement:

"Last night Detective Riddle talked about his contact with Mr. Stafford. Mr. Stafford agreed she had been to my house—[S.W.] had been to my house many times. Been all over the place. In fact, one time she maybe even slept in the bed with me while her mom was passed out somewhere, maybe she ended up on the couch, I don't know. How fortuitous for this story that he would admit that she'd been there, admit that he had shared a bed with the child.

"When the Detective sits down across the table from him and says, I'm here to talk about you and [S.W.] having sex. I mean, Riddle didn't lay and wait and sneak attack him. He was right up front with him. I want to talk to you about having sex with a kid. Does Mr. Stafford come across the table? Does he say, what the hell are you talking about? No. He sits there.

"It's pages later in the interview—

"[STAFFORD'S DEFENSE COUNSEL]: Well, to which I object.

"The Court: I'm going to overrule your objection at this time.

"[PROSECUTOR]: If I—if you don't agree that's what Riddle said, disregard my comments. But didn't Riddle say that it's later on in the interview that he finally says, well, no, I never did that."

In his closing argument, Stafford's defense counsel responded to the prosecutor's comment by saying, "And we don't like the way

Reggie denied the allegations. He didn't scream he didn't do it. He said he didn't do it. He denied it; isn't that true, Detective? Yeah. Okay. But we didn't like it. We didn't like how he denied it."

*Analysis*

In *State v. Edwards*, 264 Kan. 177, 195, 955 P.2d 1276 (1998), we stated:

"A *Doyle* violation occurs when the State attempts to impeach a defendant's credibility at trial by arguing or by introducing evidence that the defendant did not avail himself or herself of the first opportunity to clear his or her name when confronted by police officers but instead invoked his or her constitutional right to remain silent. [Citation omitted.]"

In *State v. Clark*, 223 Kan. 83, 87-89, 574 P.2d 174 (1977), this court determined that *Doyle* also prohibits a prosecutor from commenting on a defendant's postarrest silence even if the silence occurs after the defendant has already made a statement to the police. The *Clark* court reasoned that "[a]n accused may remain completely silent, and he is under no duty to volunteer his exculpatory story. Thus, he should be afforded the same right after some discussion with the police when he remains silent as to matters later asserted at trial." *Clark*, 223 Kan. at 89. Applying this rationale, *Clark* held that "*Doyle* prohibits a state prosecutor from impeaching a defendant's alibi defense told for the first time at trial, when the defendant carried on limited discussion with police after arrest, but remained silent as to matters subsequently asserted at his trial." *Clark*, 223 Kan. at 89.

The State contends that the prosecutor's argument regarding Stafford's failure to respond to Riddle's initial comment at the interview was a proper discussion of the evidence admitted at trial. The State maintains that such argument properly asked the jury to consider the credibility of Stafford's denial of wrongdoing at the interrogation given the fact that it occurred, not at the start of the interrogation, but after the interrogation was well underway.

Though "a prosecutor is permitted to draw reasonable inferences from the evidence and is given latitude in drawing those inferences," *State v. Stano*, 284 Kan. 126, 151, 159 P.3d 931 (2007),

we find that it is unreasonable for a prosecutor to argue that a defendant's guilt can be inferred from his or her failure to respond to a detective's statement or question at a custodial interrogation. Just like a defendant is under no obligation to volunteer an exculpatory story at a custodial interrogation, *Clark*, 223 Kan. at 89, a defendant is under no obligation to provide a response to a statement or question posed to him or her at an interrogation. Accordingly, the fact that a defendant failed to respond to a statement or question during an interrogation cannot be used at trial to infer guilt on the part of the defendant. This is consistent with *Miranda v. Arizona*, 384 U.S. 436, 471, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966), which requires defendants subjected to custodial interrogations to be informed, among other things, that they have a right to remain silent and that anything they say during an interrogation can be used in evidence against them. A defendant's silence at a custodial interrogation in response to a law enforcement officer's statement or question certainly does not qualify as a statement that can be used against the defendant at a subsequent trial. Thus, we conclude that the prosecutor's comment during his closing argument—suggesting that Stafford was guilty of the charged crimes because he failed to respond to Riddle's comment at the start of the interrogation (*i.e.*, "this has to do with your sexual contact with [S.W.]")—were improper.

Because we have found that the prosecutor committed misconduct during his closing argument, we move on to the second prong of the prosecutorial misconduct analysis:

"When a prosecutor makes an improper comment during closing argument, an appellate court conducts a harmlessness inquiry, determining whether the misconduct was so prejudicial that it denied the defendant a fair trial. Three factors are considered. First, was the misconduct gross and flagrant? Second, was the misconduct motivated by ill will? Third, was the evidence of such a direct and overwhelming nature that the misconduct would likely have had little weight in a juror's mind? None of these three factors is individually controlling." *Marshall*, 294 Kan. 850, Syl. ¶ 3.

With regard to the first factor—whether the misconduct was gross and flagrant—we consider whether the misconduct was repeated, was emphasized, violated a long-standing rule, violated a

clear and unequivocal rule, or violated a rule designed to protect a constitutional right. *Marshall*, 294 Kan. 850, Syl. ¶ 6. Here, the prosecutor only made one comment regarding Stafford's nonresponse to Riddle's statement. Thus, we cannot say that the prosecutor repeated or emphasized the improper argument. But we do note that the prosecutor's comment violated a long-standing rule designed to protect a defendant's right to remain silent at a custodial interrogation. Accordingly, we find that the prosecutor's comment was gross and flagrant.

In analyzing whether a prosecutor's misconduct was motivated by ill will, we consider whether the misconduct was deliberate, repeated, or in apparent indifference to a court's ruling." *Marshall*, 294 Kan. 850, Syl. ¶ 7. The prosecutor made a single comment during his closing argument regarding Stafford's failure to respond to Riddle's statement. The comment was not made in apparent indifference to an earlier ruling by the district court. In fact, even though the district court overruled defense counsel's objection to the prosecutor's comment, the prosecutor proceeded to tell the jury to disregard his comment if it was not consistent with Riddle's testimony. The prosecutor then quickly moved on to another line of argument. Accordingly, we conclude that the comment was not the result of ill will on the part of the prosecutor.

Finally, we turn to the third factor: Was the evidence of such a direct and overwhelming nature that the misconduct would likely have had little weight in the minds of jurors? In answering this question, the State, as the party "benefitting from the prosecutorial misconduct, bears the burden to establish beyond a reasonable doubt that the error did not affect the defendant's substantial rights, *i.e.*, there is no reasonable possibility the error affected the verdict." *State v. Inkelaar*, 293 Kan. 414, 431, 264 P.3d 81 (2011); see, *e.g.*, *State v. Raskie*, 293 Kan. 906, 918, 269 P.3d 1268 (2012) (finding prosecutor's misstatement did not affect the outcome of the trial in light of the entire record).

The State contends that the prosecutor's comment had little effect on the result of the trial given the fact that S.W. disclosed to multiple people that she was sexually abused and described the abuse in a manner that was generally consistent (*i.e.*, Wells took

S.W. to Stafford's house numerous times during the 2006-2007 school year where Stafford raped and orally sodomized her). Though her description of the sexual abuse may have varied slightly each time she was interviewed, S.W. was consistent that "Reggie," a man she later identified as Stafford, had raped and orally sodomized her. Accordingly, we conclude that the prosecutor's comment regarding Stafford's failure to respond to Riddle's statement at the beginning of the interrogation would likely have had little weight in the minds of the jurors in determining whether Stafford was guilty of the two rape counts and the one count of aggravated criminal sodomy (oral). We note that the jury acquitted Stafford of the aggravated criminal sodomy count alleging anal sodomy. The jury's verdict for this count was likely based on S.W.'s testimony at trial denying that anyone had ever touched her "bottom" in a way that she did not like. Accordingly, we believe the jury's verdict shows that the jury carefully considered which crimes were proven beyond a reasonable doubt by the evidence presented at trial.

We conclude that the prosecutor's comments did not improperly prejudice the jury against Stafford as to deny him a fair trial.

### CUMULATIVE ERROR

Next, Stafford argues that the cumulative effect of the errors committed at his trial substantially prejudiced his right to a fair trial. "Cumulative error will not be found when the record fails to support the errors raised on appeal by the defendant. [Citations omitted.]" *State v. Cofield*, 288 Kan. 367, 378, 203 P.3d 1261 (2009). A single error cannot constitute cumulative error. *State v. Foster*, 290 Kan. 696, 726, 233 P.3d 265 (2010).

Although we concluded that the prosecutor's comment regarding Stafford's nonresponse to Riddle's statement at the interrogation was improper, we also concluded that the comment was not so prejudicial as to deny Stafford a fair trial. Because one error is not sufficient to constitute cumulative error, we conclude that cumulative error did not deny Stafford the right to a fair trial.

## THE DENIAL OF STAFFORD'S MOTION FOR A DEPARTURE SENTENCE

Stafford argues that the district court abused its discretion when it denied his motion for a departure sentence under K.S.A. 21-4643(d) because substantial and compelling reasons existed to justify granting the motion. Again, a district court abuses its discretion if the judicial action:

"(1) is arbitrary, fanciful, or unreasonable, *i.e.*, if no reasonable person would have taken the view adopted by the trial court; (2) is based on an error of law, *i.e.*, if the discretion is guided by an erroneous legal conclusion; or (3) is based on an error of fact, *i.e.*, if substantial competent evidence does not support a factual finding on which a prerequisite conclusion of law or the exercise of discretion is based." *State v. Ward*, 292 Kan. 541, 550, 256 P.3d 801 (2011), *cert. denied* 132 S. Ct. 1594 (2012) (citing *State v. Gonzalez*, 290 Kan. 747, 755-56, 234 P.3d 1 [2012]).

### Applicable Facts

Prior to sentencing, Stafford filed a motion requesting a departure sentence. The short motion asserted two grounds supporting departure: a criminal history score based on "prior convictions not related to an offense of this nature" and a lack of "violent or dangerous" crimes in his criminal history. He elaborated on these grounds at the sentencing hearing.

The district judge denied the motion, stating:

"Well, I do not believe there are any grounds whatsoever that would justify a departure in this case. I will deny the request for a departure.

"I will also note that I did hear pretrial motions and evidence in regards to Mr. Stafford. Evidence that indicated to you, Mr. Stafford, that this was not an isolated set of incidents. As a matter of fact, I believe every female child in the family you've had some kind of sexual contact with prior to their reaching the age of consent."

Notably, at an evidentiary hearing on the State's pretrial motion to present K.S.A. 60-455 evidence, the court heard testimony from one of S.W.'s sisters who testified that Stafford had sexual relations with her when she was 12 or 13 years old while Wells was present in the same room and encouraging her to perform the sexual acts. This sister also testified that Stafford had molested S.W.'s other sister when she was a child.

*Analysis*

Jessica's Law provides that a first-time offender convicted of rape in violation of K.S.A. 21-3502(a)(2) or aggravated criminal sodomy in violation of K.S.A. 21-3506(a)(1) must be sentenced to life imprisonment with a minimum term of not less than 25 years "unless the judge finds substantial and compelling reasons, following a review of mitigating circumstances, to impose a departure." K.S.A. 21-4643(a)(1), (d). K.S.A. 21-4643(d) provides a nonexclusive list of mitigating circumstances a district court may consider when deciding whether to depart from the statutorily prescribed sentence. A district court, however, is not obligated to depart simply because a mitigating factor exists. Rather, a district court has the discretion to either grant or deny the request. In exercising this discretion, a district court first reviews the mitigating circumstances and then weighs those circumstances against any aggravating circumstances, ultimately determining whether substantial and compelling reasons warrant a departure. See *State v. Baptist*, 294 Kan. 728, 733, 280 P.3d 210 (2012). But Jessica's Law does not require a district court to state the reasons why it denied a departure motion; the statute only requires the district court state on the record the substantial and compelling reasons for why it granted a departure motion. See K.S.A. 21-4643(d); *Baptist*, 294 Kan. at 733-35.

Without the second or third prongs of the abuse of discretion standard at issue, Stafford essentially asserts no reasonable person would have agreed with the district court's decision in light of the mitigating factors he asserted in support of his departure motion. We conclude, however, that based on crimes committed against S.W. and the evidence the district court heard indicating that Stafford had engaged in the same type of conduct with S.W.'s older sister, reasonable people would agree that denying the departure motion and imposing a hard 25 life sentence for each of Stafford's convictions was appropriate. Accordingly, we conclude that the district court did not abuse its discretion by denying Stafford's departure motion.

## CRUEL AND UNUSUAL PUNISHMENT

Finally, Stafford contends that his three consecutive hard 25 life sentences constitute cruel and unusual punishment in violation of the Eighth Amendment to the United States Constitution and § 9 of the Kansas Constitution Bill of Rights. He admits he is raising this issue for the first time on appeal, but he urges this court to address the merits of the issue. The State argues this issue was not preserved for appeal because it was not raised before the district court. In support of its contention, the State cites *State v. Ortega-Cadelan*, 287 Kan. 157, 161, 194 P.3d 1195 (2008), and its progeny. The State's contention is correct.

In support of his argument that his sentences constitute cruel and unusual punishment under the Eighth Amendment and § 9 of the Kansas Constitution Bill of Rights, Stafford cites the three-part test from *State v. Freeman*, 223 Kan. 362, 367, 574 P.2d 950 (1978), for determining whether a sentence is unconstitutionally dispro-portionate:

"(1) The nature of the offense and the character of the offender should be examined with particular regard to the degree of danger present to society; rele-vant to this inquiry are the facts of the crime, the violent or nonviolent nature of the offense, the extent of culpability for the injury resulting, and the penological purposes of the prescribed punishment;

"(2) A comparison of the punishment with punishment imposed in this juris-diction for more serious offenses, and if among them are found more serious crimes punished less severely than the offense in question the challenged penalty is to that extent suspect; and

"(3) A comparison of the penalty with punishments in other jurisdictions for the same offense." *Freeman*, 223 Kan. at 367.

This court has repeatedly held that a cruel and unusual punish-ment argument based on *Freeman* cannot be raised for the first time on appeal because *Freeman's* three-part test involves both legal and factual inquiries that the district court must determine. In fact, this precise preservation issue has been addressed in the context of a defendant's claim that his life sentence under Jessica's Law is a cruel and unusual punishment. See, *e.g.*, *State v. Levy*, 292 Kan. 379, 384-85, 253 P.3d 341 (2011); *State v. Trevino*, 290

Kan. 317, 320-22, 227 P.3d 951 (2010); *Ortega-Cadelan*, 287 Kan. at 161.

Consistent with this court's caselaw, we decline to address the merits of Stafford's argument because it cannot be raised for the first time on appeal.

Affirmed.