NOT DESIGNATED FOR PUBLICATION

No. 119,230

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

STATE OF KANSAS,
*Appellee*,

v.

RICHARD D. MCHENRY,
*Appellant*.

MEMORANDUM OPINION

Appeal from Reno District Court; TRISH ROSE, judge. Opinion filed May 15, 2020. Affirmed.

*Jennifer C. Roth*, of Kansas Appellate Defender Office, for appellant.

*Keith E. Schroeder*, district attorney, and *Derek Schmidt*, attorney general, for appellee.

Before SCHROEDER, P.J., MALONE and STANDRIDGE, JJ.

PER CURIAM: Richard D. McHenry appeals his convictions of two counts of aggravated criminal sodomy. McHenry claims: (1) the district court failed to fulfill its gatekeeping function when it admitted evidence of uncharged sexual misconduct as well as a prior conviction of aggravated criminal sodomy as propensity evidence under K.S.A. 2019 Supp. 60-455(d); (2) the district court erred when it admitted a written statement from his ex-wife detailing the basis of his prior conviction because it was improper cumulative evidence; (3) K.S.A. 2019 Supp. 60-455(d) is unconstitutional; (4) the district court erred when it denied his motion to suppress statements made to law enforcement; (5) the State committed prosecutorial error in closing argument by arguing facts not in evidence; (6) the district court erred in denying his motion for a new trial; (7) cumulative

1

error deprived him of a fair trial; and (8) his convictions are multiplicitous. For the reasons stated below, we find no reversible error and affirm McHenry's convictions.

FACTUAL AND PROCEDURAL BACKGROUND

We begin by describing the prolonged and abnormal relationship between McHenry and E.N., the victim of the sex crimes for which McHenry was convicted. E.N. was raised in a strict and conservative religious environment on a small farm in a closed Mennonite community in Reno County. Within E.N.'s Mennonite church and community, a group of elders had formed a prison ministry program. Once the inmates were released from prison, the prison ministry program would guide them into their community, provide them housing, jobs, and other things difficult for convicted felons to obtain. McHenry was one of these inmates integrated back into her community. He had been convicted in 2000 of aggravated criminal sodomy in an incident involving his ex-wife.

E.N. first met McHenry when she began working as a calf feeder at a local dairy where he was employed as an agriculture mechanic. When they met, E.N. was around 14 or 15 years old and McHenry was 46 or 47 years old; so he was 32 years older than she was. McHenry took an interest in E.N., and the two became friends. When E.N. was 16 years old, she and McHenry were driving in his truck and he tried to hold her hand. E.N. did not feel comfortable holding hands. After that incident, E.N. became more withdrawn in the friendship.

When E.N. was 17 years old, McHenry told her he had cancer. He told her he did not want anybody in the community to know about his cancer because he "didn't want a bunch of casseroles and people worrying about him." While cleaning his home one day, McHenry showed her a form of "natural" cancer treatment that was supposed to relieve tension and expel harmful substances from his body through his penis. He laid down, lowered his pants, and began masturbating. He told her the stuff coming from his penis

2

was bad for him. He told her it was extremely painful but something his doctor said he had to do even if it hurt because it would make him better. McHenry asked E.N. to "help him" and told her his doctor said the benefits to his body would increase if someone he trusted and cared about performed the treatment procedure. E.N. had never seen a man ejaculate before. E.N. helped McHenry as asked and began "helping him" on a regular basis. It became their secret.

When E.N. was 18 or 19 years old, McHenry asked her to move into the basement of his home, which was like an apartment with a living room and bedroom. She took him up on his offer but ultimately slept in his bedroom instead of the basement. Although they slept in the same bedroom for the next five or six years, they never engaged in sexual intercourse. Once she moved in, E.N. became financially dependent upon McHenry to be successful. McHenry provided her a truck and paid for her gas so that she could attend college classes.

Occasionally, McHenry physically controlled her with fear. He stood 6 feet, 3 inches tall and weighed approximately 200 pounds. By contrast, E.N. was 5 feet, 3 inches tall and weighed 110 pounds. One time he shoved her from a vehicle into the ditch and made her walk home in the middle of winter. Another time he grabbed her by the throat, slammed her head against a door breaking it and caused a gash to her head. He became remorseful afterward and superglued the laceration shut. On one occasion, E.N. awoke to find McHenry's penis between her legs. She had no memory of how his penis ended up between her legs; McHenry, however, told her that it was her fault.

By the time E.N. was a senior in college, her perspective on the relationship between she and McHenry began to change. She started to question his cancer because she never saw any medical bills for treatments or doctors. She began to enlarge her circle of friends and interests. E.N. became involved in the Model United Nations and went to

Europe for two weeks in November 2015. When E.N. returned, McHenry began treating her differently. He was rough, on edge, hypercritical, and generally unhappy with her.

Until New Years Eve of 2015, the sexual interaction between McHenry and E.N. had been limited to oral contact with and touching of his genitals; they had not had sexual intercourse. On New Year's Day, E.N. went to the bedroom to get ready for bed. McHenry locked the door, forced E.N. to take off all her clothes, told her he was going to "fuck [her] in all of [her] holes," took her neck and forcibly pushed her mouth onto his penis, made her swallow his semen, and then told her he was going to bring his friends over so they could do what they wanted with her. At some point during the sexual assault, McHenry pushed his penis into E.N.'s vagina. This was the first time that E.N. had been vaginally penetrated so she began to bleed. McHenry told her the blood likely was some sort of "pre-period." At this point, E.N. did not trust McHenry anymore and feared him. She did not tell her parents because she dreaded community embarrassment and did not think anyone would be on her side.

While still attending college, E.N. temporarily moved to Topeka for an internship. While in Topeka, McHenry would tell her stories about sick dogs or mechanical problems with the truck in order to get her to return to his home on weekends. During one trip back, McHenry took sexually explicit photographs and a video of her, which he threatened to post on social media for everyone to see.

From April 20-26, 2016, E.N. traveled to Washington D.C. to visit a college friend. Before leaving, E.N. told McHenry she was moving out and asked him to get her belongings out of his house so she could pick them up. McHenry was very angry. When she returned from her trip, E.N. moved back home with her parents, even though her possessions were still at McHenry's home. Although she did not explain to her parents why she had moved home, they were aware something was happening. McHenry was acting strangely, and their daughter was acting a little scared.

4

On April 29, 2016, McHenry made an early morning phone call to E.N.'s parents' house while E.N. was asleep. Without explanation, he said he needed to speak with their daughter, and she needed to come to his home. Upset about McHenry waking her parents, E.N. went to his home. When she arrived, McHenry told her he needed to go to Agri Center in Hutchinson to purchase a part for a piece of farm equipment that had broken down. E.N. went with McHenry to get the part. On the way home, they stopped at McDonald's and she bought McHenry a Coke.

When they returned to McHenry's house, E.N. began gathering her belongings from the basement. She had gotten her ears pierced in Washington D.C., which upset McHenry, who grabbed one of her ears and said, "[W]hat's this, a whore earring?" He then kicked her in the stomach so hard she doubled over. He told her she was never going to leave that day, which she interpreted as a threat to kill her. As she pled with him, McHenry ordered her to the upstairs bedroom and said, "[T]his is it."

McHenry locked the bedroom door, ordered E.N. to disrobe, and then forced her mouth onto his penis. He ejaculated into her mouth and made her swallow his semen. He then forced her face down on the bed and penetrated her rectum with his penis. After the sexual assaults, McHenry became extremely remorseful, cried, and told E.N. he was worried she would tell someone about them. McHenry told E.N. he needed help and wanted to go to Horizons Mental Health Center because he had something in his brain making him do things to her. They traveled to Horizons, where McHenry met with the Director of the Crisis Intervention Team. E.N. sat alone in the waiting room. McHenry was not a patient at Horizons, and he had shown up without an appointment. He reported struggling with depression and anxiety symptoms but did not reveal he had just sexually assaulted E.N. While E.N. sat in the waiting room, she telephoned her mother and asked her to pick her up. Her mother immediately drove to Horizons. E.N. got into her mother's car, and they left. This was the last time E.N. was ever in McHenry's physical presence.

5

When her mother picked her up, E.N. did not say anything about being sexually assaulted by McHenry. She did tell her mother, however, that McHenry had kicked her in the stomach. This was the first time she had ever said anything about McHenry being physically violent with her. E.N.'s mother became upset and told her she did not want her around McHenry again. E.N. eventually told her parents what had happened. McHenry was later interviewed by the police. He admitted engaging in sexual intercourse with E.N. but claimed it first happened when she was 21 years old and everything was consensual. After obtaining a search warrant, the police found photographs and a video of E.N.'s vaginal area on McHenry's phone, and he claimed they were taken by consent.

On May 25, 2016, the State charged McHenry with two counts of aggravated criminal sodomy—one for forced oral sodomy and one for forced anal penetration—relating to the incident that occurred on April 29, 2016. The State later charged McHenry with four counts of failing to register his social media and e-mail accounts under the Kansas Offender Registration Act (KORA). McHenry filed several pretrial motions, including a motion to suppress his statements to law enforcement and motions to exclude evidence of his prior conviction and uncharged acts of sexual misconduct with E.N. The district court denied his motions.

At trial in October 2017, McHenry's ex-wife testified and gave a detailed account of the facts underlying McHenry's prior conviction of aggravated criminal sodomy. E.N. testified about the history of her relationship with McHenry and the details of the incident on April 29, 2016. E.N.'s parents and several law enforcement officers also testified. At the close of the State's case-in-chief, the district court granted a directed verdict of acquittal on the four KORA violation charges but found there was sufficient evidence to submit the aggravated criminal sodomy charges to the jury. McHenry did not testify at trial, but he called witnesses on his behalf to assert that McHenry was with them on the morning that E.N. claimed McHenry committed the sex crimes for which he was charged.

6

The jury found McHenry guilty of both counts of aggravated criminal sodomy. The district court denied McHenry's renewed motion for judgment of acquittal or, alternatively, a new trial. It also denied McHenry's motion for a downward durational departure, sentencing him to 285 months' imprisonment for Count 1, with a consecutive sentence of 165 months' imprisonment for Count 2, for a total controlling sentence of 450 months' imprisonment with lifetime postrelease supervision. Additional facts will be provided to address the issues McHenry raises on appeal.

### ADMISSION OF K.S.A. 60-455 EVIDENCE

On appeal, McHenry first claims the district court failed to fulfill its gatekeeping function when it admitted (1) evidence from and about E.N. concerning alleged, never-charged, prior sexual misconduct and (2) evidence about his 17-year-old prior conviction of aggravated criminal sodomy involving his ex-wife. McHenry acknowledges that such evidence is generally admissible under K.S.A. 2019 Supp. 60-455(d) and may be considered for any matter to which it is relevant and probative, including his propensity to commit the charged crimes. But McHenry argues the evidence was not relevant and probative in this case, and he focuses on his assertion that the district court failed to weigh the probative value of the evidence against its potential for producing undue prejudice at his trial.

The State responds that the district court did not err in admitting the evidence of McHenry's prior conviction and the uncharged sexual misconduct with E.N. The State argues that the evidence was admissible under K.S.A. 2019 Supp. 60-455(d) to show McHenry's propensity to commit the charged crimes. The State also argues that the evidence was properly admitted in this case because it was relevant and probative to the charges.

7

Admission of evidence involves several legal considerations: determining relevance; identifying and applying legal principles including rules of evidence; and weighing prejudice against probative value. See *State v. Shadden*, 290 Kan. 803, 817-18, 235 P.3d 436 (2010). Depending on the consideration at issue, an appellate court applies different standards of review. First, a court must determine whether the evidence is relevant. All relevant evidence is admissible unless prohibited by statute, constitutional provision, or court decision. See K.S.A. 60-407(f); *Nauheim v. City of Topeka*, 309 Kan. 145, 153, 432 P.3d 647 (2019). K.S.A. 60-401(b) defines relevant evidence as "evidence having any tendency in reason to prove any material fact." See *State v. Lowery*, 308 Kan. 1183, 1226, 427 P.3d 865 (2018). Relevance has two elements: a materiality element and a probative element. See *State v. Miller*, 308 Kan. 1119, 1167, 427 P.3d 907 (2018).

Evidence is material when the fact it supports is in dispute or in issue in the case. *Miller*, 308 Kan. at 1167. The appellate standard of review for materiality is de novo. 308 Kan. at 1166. Evidence is probative if it has any tendency to prove any material fact. 308 Kan. at 1167. Whether evidence is probative is reviewed for abuse of discretion. 308 Kan. at 1166. Even if evidence is relevant, a district court has discretion to include it where the court finds its probative value is outweighed by its potential for producing undue prejudice. See K.S.A. 60-445. An appellate court reviews any such determination for an abuse of discretion. *State v. Ingham*, 308 Kan. 1466, 1469, 430 P.3d 931 (2018).

A court's consideration of the admissibility of evidence can also require application of statutory rules controlling the admission and exclusion of certain types of evidence. Whether a particular legal principle or statutory rule governs the admission of particular evidence is a question of law subject to de novo review. *Miller*, 308 Kan. at 1166. A principle or rule, however, is applied as a matter of law or as an exercise of the district court's discretion, depending on the applicable rule. 308 Kan. at 1166.

Here, the statute governing the admission of the challenged evidence is K.S.A. 2019 Supp. 60-455(d) which provides in part:

> "Except as provide in K.S.A. 60-445, and amendments thereto, in a criminal action in which the defendant is accused of a sex offense under articles 34, 35 or 36 of chapter 21 of the Kansas Statutes Annotated, prior to their repeal, or articles 54, 55 or 56 of chapter 21 of the Kansas Statutes Annotated, . . . evidence of the defendant's commission of another act or offense of sexual misconduct is admissible, and may be considered for its bearing on any matter to which it is relevant and probative."

Before trial, McHenry filed a motion in limine asking the court to prohibit the State from introducing or referring to "uncharged, unproven acts of sexual misconduct" against E.N. included in discovery provided by the State to the defense. The motion did not specifically identify the alleged acts of uncharged sexual misconduct that McHenry sought to exclude. McHenry also filed a motion in limine to exclude any evidence or reference to his prior conviction of aggravated criminal sodomy involving his ex-wife.

At the pretrial hearing on the motions, McHenry argued only that he was seeking to exclude evidence of uncharged sexual misconduct with E.N. as well as evidence of the prior conviction. McHenry clarified that he was *not* asking the court to exclude evidence of voluntary sexual conduct between McHenry and E.N. McHenry argued that the evidence of his uncharged sexual misconduct with E.N. and the evidence of his prior conviction was not relevant or probative to prove the current charges. He also argued that the probative value of the evidence was outweighed by its potential for producing undue prejudice at his trial. Conversely, the State argued that the challenged evidence was relevant and probative to prove the current charges and its probative value outweighed any prejudice. After hearing the arguments, the district court denied the motions.

At trial, McHenry's ex-wife gave a detailed account of the facts underlying McHenry's prior conviction of aggravated criminal sodomy. E.N. testified about the

9

history of her relationship with McHenry and the details of the incident on April 29, 2016. E.N.'s testimony included her description of uncharged sexual misconduct committed by McHenry against her during the course of their relationship.

On appeal, McHenry renews his argument that the district court erred when it admitted evidence of his alleged uncharged sexual misconduct with E.N. and the evidence of his prior conviction of aggravated criminal sodomy involving his ex-wife. McHenry argues that the evidence was not relevant and probative in this case. He asserts the district court "failed to fulfill its gatekeeping function" by not weighing the probative value of the evidence against its potential for producing undue prejudice at his trial.

McHenry was charged with two counts of aggravated criminal sodomy in violation of K.S.A. 2019 Supp. 21-5504(b)(3)(A). He acknowledges that as someone charged with such crimes, evidence of his commission of another act or offense of sexual misconduct is admissible under K.S.A. 2019 Supp. 60-455(d) and may be considered for any matter to which it is relevant and probative, including propensity to commit the charged crimes. He does not dispute that when evidence of a prior sex offense is admitted for propensity, a limiting instruction is not required. *State v. Perez*, 306 Kan. 655, 673, 396 P.3d 78 (2017).

But as McHenry argues in his brief, even evidence that qualifies as K.S.A. 2019 Supp. 60-455(d) evidence is not automatically admissible. The district court must still perform its gatekeeping function to insure "the probative value of the evidence must outweigh its potential for producing undue prejudice." *State v. Boysaw*, 309 Kan. 526, Syl. ¶ 7, 439 P.3d 909 (2019). McHenry points out that in denying his pretrial motions concerning the K.S.A. 60-455 evidence, the district court merely found that it was "not able to find a legal basis to exclude the evidence." The district court made no attempt to expressly state its findings on the record in conducting the required analysis of weighing the probative value of the evidence against its potential for producing undue prejudice.

But the Kansas Supreme Court has never ruled that the district court must expressly state its findings on the record in weighing the probative value of K.S.A. 60-455 evidence against its potential for producing undue prejudice. In fact, our Supreme Court has stated that an appellate court can presume the district court conducted the proper analysis even if it did not explicitly state its reasoning on the record, in the absence of an objection to inadequate findings. See *State v. Razzaq*, 309 Kan. 544, 548-49, 439 P.3d 903 (2019). In that case, the defendant was charged with a sex crime and argued that the district court should exclude evidence of his prior convictions of sex crimes in another state. The district court allowed the evidence under K.S.A. 2019 Supp. 60-455(d) to show propensity without expressly weighing the probative value of the evidence against the prejudicial effect. In finding no error, our Supreme Court stated:

> "Although the district court did not explicitly determine that the probative value outweighed the prejudicial effect, this court may presume that the district court made all the necessary factual findings to support its judgment in the absence of an objection to inadequate findings. [Citation omitted.] We conclude that the district court implicitly rejected Razzaq's argument of prejudice when it denied his motion." 309 Kan. at 548-49.

Here, at the pretrial hearing on the motions to exclude the K.S.A. 2019 Supp. 60-455(d) evidence, McHenry gave several reasons why the probative value of the evidence was outweighed by its prejudicial effect. In response, the State argued the opposite. The better practice would have been for the district court to make specific findings and expressly consider the appropriate factors for weighing the probative value of the evidence against its potential for producing undue prejudice. See *Boysaw*, 309 Kan. at 541. But we have no reason to find that the district court ignored the arguments presented by the parties at the hearing and denied McHenry's motions without conducting the required analysis. McHenry did not object to the inadequacy of the district court's findings. In the absence of an objection, we conclude that the district court implicitly rejected McHenry's argument of prejudice when it denied his motions. See *Razzaq*, 309 Kan. at 548-49; *State v. Claerhout*, 310 Kan. 924, 930, 453 P.3d 855 (2019) (upholding

11

admission of K.S.A. 60-455 evidence although "the district court's stated reasoning was so abbreviated that we cannot determine what factors, if any, it considered in reaching its conclusion that the probative value outweighed the potential prejudicial effect").

Presuming the district court made all the necessary findings to support its ruling, we will now focus on the challenged evidence admitted at McHenry's trial to decide whether the district court erred by admitting the evidence in violation of K.S.A. 2019 Supp. 60-455(d). We will first address the evidence of McHenry's prior conviction of aggravated criminal sodomy. Next, we will address the evidence of McHenry's uncharged sexual misconduct with E.N. As stated earlier, the district court's implicit finding that the probative value of the evidence outweighs its potential for producing undue prejudice is reviewed for an abuse of discretion. *Ingham*, 308 Kan. at 1469.

*Prior conviction of aggravated criminal sodomy*

Some additional facts are needed. McHenry was married to his previous wife, D.P., for about eight years. They had four children and lived in Jefferson County. D.P. was 13 years younger than McHenry. They divorced in 1998 but maintained necessary contact because of their children and insurance needs.

On February 15, 2000, D.P. tried, but was unable, to contact McHenry to retrieve the children's insurance card. Later that evening, D.P. was driving home from her parents' house with her three-month-old infant when she noticed McHenry behind her car flashing his headlights. She pulled her car over and asked him for the insurance card. He told her to follow him, which she did until they arrived in a rural area. At that point, McHenry got out of his car, came over to the passenger's side of D.P.'s car, and asked if he could talk to her. D.P. told him she had to get the baby home for a breathing treatment and just needed to retrieve the insurance card. According to D.P., McHenry slammed her car door, went back to his car, and came back with a push-button mechanism that he said was a bomb.

12

McHenry then forced D.P. and the infant into his vehicle and slashed the tires on her car. McHenry handed D.P. four pills to take, and she pretended to take them.

McHenry then randomly drove around while his demeanor varied from very angry to apologetic. He threatened to kill D.P. if she did not follow his directions and said he was going to take her someplace where "a lot of guys" would "fuck [her] because [she] was a whore." McHenry stopped the vehicle near a field, forced his penis into D.P.'s mouth, and then he vaginally raped her. During the sexual assault, McHenry instructed D.P. to tell him sexual stories about her fiancé, repeatedly called her a whore, and said she deserved getting raped and sodomized by him. McHenry always had the bomb device nearby. Eventually, after becoming suspicious that the police knew he had abducted D.P., McHenry again became apologetic and drove to a location where he turned himself in.

Pursuant to the terms of a negotiated plea agreement, McHenry pled guilty to a charge of aggravated criminal sodomy in exchange for a mitigated sentence of eight years in prison and the requirement that he register as a sex offender under KORA.

At McHenry's trial on the current charges, D.P. testified and gave a detailed account of the facts underlying McHenry's prior conviction of aggravated criminal sodomy. The State also introduced State's Exhibit 2, an 11-page written statement from D.P. detailing the facts underlying the conviction. McHenry now argues that this evidence was not properly admitted under K.S. A. 2019 Supp. 60-455(d).

As the State argues in its brief, the prior conviction of aggravated criminal sodomy was directly relevant to McHenry's registration requirements under KORA, and it was an element of the charged crimes of failing to register. As to the underlying facts of the crime, this evidence was both relevant and probative to the current charges because of the similarities between the two cases. Both cases involved efforts by McHenry to isolate his victims. He made threats to kill both victims if they were not compliant. He degraded

13

both victims as being "whores" deserving of the sexual assaults. He threated both victims with being sexually assaulted by his friends. Both victims were orally sodomized. He wanted both victims to tell him sexual fantasy stories for stimulation during the sexual acts. After the sexual assaults, McHenry would assume an apologetic demeanor.

We find that this evidence was extremely probative to the material fact sought to be proved by the State, and there is little reason to believe that the evidence distracted the jury from the central issues of the trial. Granted, D.P.'s testimony described crimes of rape and aggravated criminal sodomy whereas McHenry was only charged with the latter crime. But given the nature in which the crimes against D.P. were committed, the limited testimony about the rape did not cause McHenry to suffer any additional undue prejudice. Based on the record, we conclude the evidence of McHenry's prior conviction of aggravated criminal sodomy including the underlying facts of the crime was relevant and probative to prove his current charges, and the evidence was admissible under K.S.A. 2019 Supp. 60-455(d) to show McHenry's propensity to commit the charged crimes. The district court did not abuse its discretion by implicitly finding that the probative value of the evidence outweighed its potential for producing undue prejudice at McHenry's trial.

*Evidence of uncharged sexual misconduct with E.N.*

The most significant evidence of uncharged sexual misconduct between McHenry and E.N. was the testimony about the rape and criminal sodomy on New Year's Day of 2016. E.N. testified that on New Year's Day, she went into the bedroom to get ready for bed. McHenry locked the door, forced E.N. to take off all her clothes, told her he was going to "fuck [her] in all of [her] holes," took her neck and forcibly pushed her mouth onto his penis, made her swallow his semen, and then told her he was going to bring his friends over so they could do what they wanted with her. At some point during the sexual assault, McHenry pushed his penis into E.N.'s vagina, which was the first time E.N. had engaged in sexual intercourse.

14

We agree with the State that the evidence of the New Year's Day incident was relevant and probative to prove the current charges arising from the incident on April 29, 2016. In both incidents, McHenry locked E.N. into the bedroom at his house, ordered her to disrobe, and then forced her mouth onto his penis. He ejaculated into her mouth and made her swallow his semen. Both incidents were precipitated by the same problem McHenry was facing with E.N.—she was starting to pull away from his control and showing signs that she wanted to live on her own. Again, we agree with the State that the district court did not abuse its discretion by implicitly finding that the probative value of the evidence outweighed its potential for producing undue prejudice at McHenry's trial.

The State presented other evidence at McHenry's trial that could be categorized as evidence of uncharged sexual misconduct with E.N., including the incident when E.N. woke up and "found his penis between her legs," and the time McHenry took sexually explicit photographs and a video of her and threatened to post them on social media. This evidence was relevant and probative to prove the charged crimes because it showed the control that McHenry exerted over E.N. and how McHenry was grooming her to engage in further sexual activity. The district court did not abuse its discretion by implicitly finding that the probative value of this evidence outweighed the prejudicial effect.

Finally, we note that not all the evidence of uncharged conduct admitted at McHenry's trial qualified as evidence admissible under K.S.A. 2019 Supp. 60-455(d). For instance, E.N. testified about an incident when McHenry grabbed her by the throat, slammed her head against a door, and threw her in a closet causing a gash on her head. This evidence was not admissible under K.S.A. 2019 Supp. 60-455(d) because it did not qualify as evidence of a prior act or offense of sexual misconduct. See K.S.A. 2019 Supp. 60-455(g). The evidence may have been admissible under K.S.A. 2019 Supp. 60-455(b) to prove one of the material facts listed in the statute, and in that situation a limiting instruction should have been given by the district court. See *State v. Gunby*, 282 Kan. 39, 48, 144 P.3d 647 (2006). But McHenry's pretrial motion only attempted to exclude

15

uncharged sexual misconduct with E.N., and he made no contemporary objection at trial to the evidence of the violent conduct. Thus, whether the district court erred in admitting this evidence is not properly before us on appeal.

In sum, we find the district court did not err by admitting the evidence of McHenry's uncharged sexual misconduct with E.N. and the evidence of his prior conviction of aggravated criminal sodomy under K.S.A. 2019 Supp. 60-455(d). The evidence was relevant and probative to prove the charged crimes against McHenry. Moreover, the district court did not abuse its discretion by implicitly finding that the probative value of the evidence outweighed it potential for producing undue prejudice at McHenry's trial.

### EVIDENCE OF D.P.'S WRITTEN STATEMENT

As a separate issue, McHenry claims the district court erred in admitting State's Exhibit 2, the 11-page written statement from D.P. detailing the facts underlying his prior conviction of aggravated criminal sodomy because it was improper cumulative evidence. The State argues that the district court did not abuse its discretion in admitting the written statement, and alternatively, the State asserts that any error was harmless.

We set forth our standard of review governing the admission of evidence in addressing the last issue. But generally, we review a district court's decision to allow cumulative evidence for an abuse of discretion. See *State v. Reed*, 282 Kan. 272, 280, 144 P.3d 677 (2006).

In Kansas, "prior statements of a witness, consistent with his own testimony at trial, are not admissible in corroboration of his testimony unless the witness has been impeached and then only for the purposes of rehabilitating him." *State v. Whitesell*, 270 Kan. 259, 290, 13 P.3d 887 (2000). Here, the State offered D.P.'s written statement to

corroborate her testimony even though the testimony had not been impeached and the written statement was not used to refresh her memory. Moreover, D.P. was not the victim in this case and her testimony was only being offered under K.S.A. 2019 Supp. 60-455(d). We agree with McHenry that the district court abused its discretion in admitting D.P.'s written statement because it was unnecessarily cumulative to her testimony.

The State also asserts that any error was harmless. In *State v. Ward*, 292 Kan. 541, 565, 256 P.3d 801 (2011), *cert. denied* 565 U.S. 1221 (2012), the Kansas Supreme Court held that to find an error harmless under K.S.A. 60-261, K.S.A. 60-2105, and the United States Constitution, a Kansas court must be able to declare the error "did not affect a party's substantial rights, meaning it will not or did not affect the trial's outcome." The party benefitting from the error always bears the burden of proving it harmless. See *State v. Logsdon*, 304 Kan. 3, 39, 371 P.3d 836 (2016).

The level of certainty by which a court must be convinced depends upon whether the error implicates a federal constitutional right. *Ward*, 292 Kan. at 565. Where an error implicates a statutory but not a federal constitutional right, the party benefitting from the error must persuade the court that there is no reasonable probability that the error affected the trial's outcome in light of the entire record for it to be deemed harmless. *State v. McCullough*, 293 Kan. 970, 983, 270 P.3d 1142 (2012). When an error infringes upon a party's federal constitutional right, a court will declare a constitutional error harmless only where the party benefitting from the error persuades the court "beyond a reasonable doubt that the error complained of will not or did not affect the outcome of the trial in light of the entire record, *i.e.*, proves there is no reasonable possibility that the error affected the verdict." *Ward*, 292 Kan. at 569 (citing *Chapman v. California*, 386 U.S. 18, 87 S. Ct. 824, 17 L. Ed. 2d 705, *reh. denied* 386 U.S. 987 [1967]).

We agree with the State that the district court's error in admitting the written statement over the objection asserted by McHenry was harmless. The written statement

17

was substantially similar to D.P.'s testimony and did not cause any additional undue prejudice. Although the written statement was unnecessarily cumulative, we are convinced that the error did not affect McHenry's substantial rights and it did not affect the trial's outcome in light of the entire record. *Ward*, 292 Kan. at 565.

CONSTITUTIONALITY OF K.S.A.2019 SUPP. 60-455(d)

Next, McHenry claims that K.S.A. 2019 Supp. 60-455(d) violates sections 10 and 18 of the Kansas Constitution Bill of Rights. The State asserts the statute is constitutional. An appellate court exercises unlimited review over challenges to the constitutionality of a statute. *State v. Soto*, 299 Kan. 102, 121, 322 P.3d 334 (2014).

McHenry acknowledges that our Supreme Court recently found that K.S.A. 2018 Supp. 60-455(d) does not violate federal constitutional provisions. *Boysaw*, 309 Kan. at 536. Our Supreme Court filed its decision in *Boysaw* after McHenry filed his initial brief to this court but before he filed his reply brief. He argues in his reply brief that *Boysaw* did not decide the Kansas constitutional question, so the decision is not binding precedent resolving his claims under sections 10 and 18 of the Kansas Constitution Bill of Rights.

McHenry is correct that our Supreme Court in *Boysaw* did not decide the Kansas constitutional question because the court found the defendant in that case did not properly brief the issue. See 309 Kan. at 535-38. Our Supreme Court explicitly stated:  "Any future challenge to the admission of propensity evidence under K.S.A. 2018 Supp. 60-455(d) that is based on state constitutional provisions will need to explain why this court should depart from its long history of coextensive analysis of rights under the two constitutions." 309 Kan. at 538. McHenry has offered no such explanation even though he had the chance to do so in his reply brief. Thus, we deem his argument under the state constitution waived or abandoned due to improper briefing. 309 Kan. at 537; *State v. Kingsley*, 299 Kan. 896, 900, 326 P.3d 1083 (2014).

18

Next, McHenry claims the district court erred in denying his motion to suppress statements he made to law enforcement. Specifically, he asserts the officers obtained the waiver of his rights against self-incrimination under false pretenses thereby rendering his statements involuntary. The State argues that the district court did not err in denying the motion to suppress, and alternatively, the State asserts that any error was harmless.

An appellate court, in reviewing a district court's decision regarding the suppression of a defendant's statements, reviews the district court's factual findings under the substantial competent evidence standard. The district court's ultimate legal conclusion is reviewed de novo. We do not reweigh the evidence when applying this standard. *State v. Mattox*, 305 Kan. 1015, 1035, 390 P.3d 514 (2017). The State has the burden to prove, by a preponderance of the evidence, the defendant's statement was voluntarily made. *State v. Bridges*, 297 Kan. 989, 1004, 306 P.3d 244 (2013).

Some additional facts are necessary to address McHenry's claim of error. On May 14, 2016, the Reno County Sheriff's Department was dispatched to E.N.'s parents' home on the report from her father that McHenry was driving very slowly up and down the road harassing E.N.'s family. E.N.'s father ultimately revealed to the deputies that his daughter had been beaten, sodomized, and raped by McHenry. E.N. met with a sheriff's deputy and gave a detailed statement about her long association with McHenry, including the physical abuse, sodomy, and rape. Sheriff's investigators conferenced to discuss the situation before they contacted McHenry. They were concerned about E.N.'s safety once McHenry discovered she had reported the sexual assaults. They wanted to make sure he was in a controlled environment when he learned of E.N.'s report.

On May 17, 2016, a sheriff's detective and Deputy Matthew Vieyra went to the local dairy where McHenry worked. They told McHenry they wanted to discuss the fact

that he had failed to register one of his vehicles as required by KORA, which applied to him based on his prior conviction of aggravated criminal sodomy. But they did not tell him that they also wanted to talk to him about the sexual assault allegations made by E.N. They asked him if he would be willing to come to the Law Enforcement Center to discuss the registration issue. McHenry was cooperative and voluntarily agreed to go. He was not placed under arrest or handcuffed. He was given a ride in an unmarked sheriff's vehicle.

Once they arrived, McHenry was taken to an interview room equipped with a hidden camera. Without Mirandizing him, Vieyra talked to McHenry for approximately 20 minutes about the offender registration issue. When Vieyra left the room to get his business card for McHenry, Deputy Diana Skomal entered the room and advised McHenry of his *Miranda* rights in anticipation of confronting him about E.N.'s allegations. McHenry signed a written *Miranda* waiver. Skomal then interviewed McHenry about the sexual assault allegations made by E.N. McHenry admitted engaging in sexual intercourse with E.N. but claimed it first happened when she was 21 years old and everything was consensual. When questioned about a diagnosis of cancer, McHenry was unable to give a clear answer or recall the name of his doctor.

McHenry filed a pretrial motion to suppress all statements he made during the interview, both before and after he was Mirandized. Regarding the statements McHenry made before he was Mirandized, he claimed he was in custody and not Mirandized. Regarding the statements McHenry made after he was Mirandized, he claimed he was unfairly coerced by deceit into waiving his *Miranda* rights, which necessarily rendered his statements involuntary. The State filed a response to his motion to suppress. The district court held an evidentiary hearing, and the State introduced into evidence a video of the interview for the district court's review. The court issued a written order denying the motion to suppress. Regarding McHenry's statements to Skomal after he waived his *Miranda* rights, the district court found that the totality of the circumstances supported a finding that McHenry's statements were the product of his free and independent will.

At trial, the only evidence from this interview that McHenry objected to was Skomal's testimony that McHenry initially told her he had not been diagnosed with cancer and then later told her he thought maybe he had cancer. McHenry submitted the grounds for his objection as those stated in the pretrial motion to suppress.

On appeal, McHenry argues that his statements after he waived his *Miranda* rights were involuntary as a result of being tag-teamed by Vieyra and Skomal to surprise him about the substance of the interview. When a defendant waives his or her constitutional rights against self-incrimination, we determine whether the waiver was knowing, voluntary, and intelligent under the totality of the circumstances. See *Mattox*, 305 Kan. at 1042; *State v. Lawson*, 296 Kan. 1084, 1099, 297 P.3d 1164 (2013). Our Supreme Court has set forth the following nonexclusive factors to use in making this determination:

> "(1) the defendant's mental condition; (2) the manner and duration of the interrogation; (3) the defendant's ability to communicate with the outside world; (4) the defendant's age, intellect, and background; (5) the fairness of the officers in conducting the interrogation; and (6) the defendant's proficiency with the English language." *State v. Woods*, 301 Kan. 852, 867, 348 P.3d 583 (2015).

Whether McHenry's statement to Skomal was voluntary presents a close question, but one that we need not resolve in this appeal because any error in the admission of the evidence was harmless. The only evidence from the interview that McHenry objected to at trial was his equivocation about whether he had ever been diagnosed with cancer. This evidence may have related to how McHenry manipulated E.N. during their relationship, but it had no direct bearing on McHenry's guilt or innocence of the aggravated criminal sodomy charges. Even under the constitutional harmless error standard, we find there is no reasonable possibility that any error in the admission of this evidence affected the outcome of McHenry's trial in light of the entire record.

21

McHenry contends the State committed prosecutorial error during its closing argument by arguing facts not in evidence. The State asserts that the prosecutor's challenged statements were appropriate and there was no error.

In *State v. Sherman*, 305 Kan. 88, 109, 378 P.3d 1060 (2016), our Supreme Court set forth the following two-step analysis for evaluating claims of prosecutorial error:

> "Appellate courts will continue to employ a two-step process to evaluate claims of prosecutorial error. These two steps can and should be simply described as error and prejudice. To determine whether prosecutorial error has occurred, the appellate court must decide whether the prosecutorial acts complained of fall outside the wide latitude afforded prosecutors to conduct the State's case and attempt to obtain a conviction in a manner that does not offend the defendant's constitutional right to a fair trial. If error is found, the appellate court must next determine whether the error prejudiced the defendant's due process rights to a fair trial. In evaluating prejudice, we simply adopt the traditional constitutional harmlessness inquiry demanded by *Chapman* [*v. California*, 386 U.S. 18, 87 S. Ct. 824, 17 L. Ed. 2d 705 (1967)]."

McHenry asserts the State committed prosecutorial error when it argued:

> "'*These cases* are tough because they generally involve somebody who doesn't want to be caught[,] [someone] [w]ho wants to do something that they can get away with and avoid detection. So you're not going to do something like this in the middle of the mall, where there might be a bunch of witnesses. You're going to find the right time and the right place where there's the least chance you will be caught because it will just be your word and the other person's word. *These cases* generally involve someone who has more maturity, more expertise, or intellect. Taking advantage of somebody else either through lies or deception to satisfy their own desires.'" (Emphasis added.)

22

Although we believe it is a close question, we agree with McHenry that the prosecutor erred in making this argument to the jury because he argued facts not in evidence by referring to typical circumstances involved in sex offense cases without expert testimony to support the statement. In doing so, the prosecutor failed to restrict his comments to the facts of McHenry's case. But the district court had instructed the jury to disregard any statements of counsel not supported by evidence. We find that the error was harmless in light of the entire record because there is no reasonable possibility that the error affected the verdict or prejudiced McHenry's due process rights to a fair trial.

MOTION FOR NEW TRIAL

McHenry next claims the district court erred in denying his motion for a new trial and judgment of acquittal. He argues the district court applied an erroneous legal standard and failed to properly exercise its discretion in denying the motion for new trial. The State asserts that the district court did not err in denying the posttrial motion.

After trial, McHenry filed a renewed motion for judgment of acquittal or, in the alternative, a motion for a new trial. In his request for acquittal, McHenry argued the evidence he presented at trial regarding his alibi rendered the State's evidence insufficient to prove beyond a reasonable doubt that he committed the crimes of aggravated criminal sodomy against E.N. as charged. Alternatively, McHenry sought a new trial on grounds that the district court erred in admitting evidence about his prior conviction involving D.P.; the district court erred in admitting evidence of uncharged criminal acts of sexual misconduct by him against E.N.; and the district court erred in denying his motion to suppress the statements he made to Skomal about his cancer. He also argued the district court erred by denying his request for a trial continuance, but he has not renewed this claim on appeal. The State filed a brief in opposition, and the parties argued the motion to the court before the sentencing hearing. The district court denied the motion.

*Renewed motion for acquittal*

"'A motion for judgment of acquittal is substantially the same as a motion attacking the sufficiency of the evidence.'" *State v. Taylor*, 54 Kan. App. 2d 394, 412, 401 P.3d 632 (2017). When the sufficiency of evidence is challenged in a criminal case, an appellate court reviews the evidence in a light most favorable to the State to determine whether a rational fact-finder could have found the defendant guilty beyond a reasonable doubt. *State v. Rosa*, 304 Kan. 429, 432-33, 371 P.3d 915 (2016). While engaging in this analysis, the appellate court is prohibited from reweighing evidence, resolving evidentiary conflicts, or making determinations regarding witness credibility. *State v. Dunn*, 304 Kan. 773, 822, 375 P.3d 332 (2016). But that is precisely what McHenry has requested this court to do:  find that the evidence he presented at trial regarding his alibi rendered the State's evidence insufficient to prove beyond a reasonable doubt that he committed the crimes of aggravated criminal sodomy against E.N. as charged. Viewing the evidence in a light most favorable to the State, the district court did not err in finding that a rational fact-finder could have found McHenry guilty beyond a reasonable doubt.

*Motion for a new trial*

An appellate court reviews the district court's decision on a motion for a new trial for an abuse of discretion. *State v. Williams*, 303 Kan. 585, 595, 363 P.3d 1101 (2016). "'A district court abuses its discretion if its decision is (1) arbitrary, fanciful, or unreasonable; (2) based on an error of law; or (3) based on an error of fact.'" *State v. Butler*, 307 Kan. 831, 852, 416 P.3d 116 (2018). Here, McHenry bears the burden of showing that the district court abused its discretion. *State v. Warren*, 302 Kan. 601, 614, 356 P.3d 396 (2015). The three evidentiary claims in McHenry's motion for new trial were that the district court erred in admitting evidence about his prior conviction involving D.P.; the district court erred in admitting evidence of uncharged criminal acts of sexual misconduct by him against E.N.; and the district court erred in denying his

24

motion to suppress the statements he made to Skomal about his cancer. We have already addressed these claims and found that none of them would have entitled McHenry to receive a new trial. Thus, we conclude the district court did not abuse its discretion in denying McHenry's motion for a new trial.

CUMULATIVE ERROR

McHenry argues even if none of the errors he has identified are individually reversible, he should be granted a new trial based on cumulative error. The test for cumulative error is whether the totality of the circumstances establish the defendant was substantially prejudiced by cumulative errors and was denied a fair trial. In assessing the cumulative effect of errors during the trial, this court examines the errors in the context of the entire record, considering how the trial judge dealt with the errors as they arose; the nature and number of errors and their interrelationship, if any; and the overall strength of the evidence. *State v. Holt*, 300 Kan. 985, 1007, 336 P.3d 312 (2014). If any of the errors being aggregated are constitutional in nature, their cumulative effect must be harmless beyond a reasonable doubt. *State v. Santos-Vega*, 299 Kan. 11, 27-28, 321 P.3d 1 (2014).

We have identified three errors or potential errors committed during McHenry's trial: (1) the district court erred in admitting D.P.'s written statement because it was cumulative to her testimony; (2) the prosecutor erred in closing argument by arguing facts not in evidence; and (3) without deciding whether the district court erred in admitting McHenry's statement to Skomal about his cancer, we found that any error was harmless. Based on the same reasoning that we found these errors or potential errors to be harmless individually, we are convinced beyond a reasonable doubt that the cumulative effect of these errors did not substantially prejudice McHenry and deny him a fair trial. As Kansas appellate courts have often observed, our federal and state constitutions do not entitle a criminal defendant to a perfect trial, but they do entitle him or her to a fair one. *State v. Hayden*, 281 Kan. 112, 124, 130 P.3d 24 (2006). McHenry received a fair trial.

25

Finally, McHenry claims his two convictions of aggravated criminal sodomy are multiplicitous. The State disagrees. McHenry raises this issue for the first time on appeal. This court can consider "'multiplicity challenges for the first time on appeal to serve the ends of justice or prevent a denial of fundamental rights.' [Citations omitted.]" *State v. Weber*, 297 Kan. 805, 809, 304 P.3d 1262 (2013). Appellate courts exercise unlimited review when determining whether convictions are multiplicitous. 297 Kan. at 809.

Multiplicity is the charging of a single offense in multiple counts of an information. The Double Jeopardy Clauses of the United States Constitution and the Kansas Constitution Bill of Rights prohibit the State from securing multiple convictions on multiplicitous charges. *State v. Sprung*, 294 Kan. 300, 306, 277 P.3d 1100 (2012).

To prevail on a multiplicity claim, a defendant must demonstrate: (1) that his or her convictions arose from the same conduct; and (2) that the conduct constituted one statutory offense. *Sprung*, 294 Kan. at 306-07. As for the first prong, an appellate court considers whether: "(1) the acts occurred at or near the same time, (2) the acts occurred at the same location, (3) a causal relationship existed between the acts, in particular whether an intervening event separated the acts, and (4) a fresh impulse motivated some of the conduct." 294 Kan. at 307.

McHenry admits his argument is contrary to the decision of another panel of our court in *State v. Martin*, No. 107,602, 2013 WL 5422310 (Kan. App. 2013) (unpublished opinion), but he argues *Martin* was wrongly decided. While we are free to disagree with another panel's decision, we will not do so here. *Martin* is well-reasoned, and we find it persuasive because it properly considered the plain language, punctuation, organization, and structure of Kansas' criminal sodomy statute. See 2013 WL 5422310, at *8-9.

*Martin* concluded the use of a semicolon to separate the various statutory definitions of sodomy created a separate unit of prosecution for oral and anal sodomy. See K.S.A. 2019 Supp. 21-5501(b) ("'Sodomy' means oral contact or oral penetration of the female genitalia or oral contact of the male genitalia; anal penetration, however slight, of a male or female by any body part or object; or oral or anal copulation or sexual intercourse between a person and an animal."); *Martin*, 2013 WL 5422310, at *8-9.

The reasoning in *Martin* logically extends our Supreme Court's analysis in *State v. Stafford*, 296 Kan. 25, 52, 290 P.3d 562 (2012), that criminal sodomy is an alternative means crime and there are three separate ways to commit the crime under the statute:

> "[E]ach act described within the definition of sodomy is separate and distinct from the other—the acts are factually different from one another, and one act is not inclusive of the others. Furthermore, each act is separated by a semicolon, which suggests that the legislature intended for each act to constitute a specific means of completing the general act of sodomy."

Here, E.N. described two separate, factually distinct acts: (1) oral contact with McHenry's penis and (2) anal penetration by McHenry's penis. McHenry's aggravated criminal sodomy convictions were based on one act of oral sodomy and one act of anal sodomy. And the jury was properly instructed each charge was a separate and distinct offense, and its verdict had to be based separately on the evidence and law applicable to each offense. The State correctly charged each act separately, and McHenry's resulting convictions are not multiplicitous. See K.S.A. 2019 Supp. 21-5501(b); *Stafford*, 296 Kan. at 52; *Martin*, 2013 WL 5422310, at *9.

Affirmed.